**Vicente B. CHUIDIAN, Plaintiff,**

**v.**

**PHILIPPINE NATIONAL BANK, et al., Defendants,**

**Philippine Export and Foreign Loan Guarantee Corporation, Intervenor.**

**No. CV 86–2255–RSWL.**

United States District Court, C.D. California.

April 9, 1990.

Steven C. Finley, San Francisco, Cal., for plaintiff.

Joanne Frasca and Douglas Altschuler, Jones, Day, Reavis & Pogue, Max L. Gillam and Thomas R. Freeman, Latham & Watkins, Los Angeles, Cal., and Gregory P. Landis, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants.

## ORDER AND JUDGMENT

LEW, District Judge.

This matter was tried before the Court from July 25, 1989 to August 18, 1989. Based upon the evidence presented during trial and upon the arguments made in the post-trial briefs, the Court issues the following order.

### I. BACKGROUND

In September 1980, Asian Reliability Company, Inc. ("ARCI"), of which Chuidian owns 98%, filed a request with Philippine Export and Foreign Loan Guarantee Corporation ("Philguarantee") for a loan guarantee ultimately totalling $25 million. ARCI represented to Philguarantee and the lenders that the proceeds from the loan were to be used in five interrelated electronics projects (the "business plan" or "project plan"). These projects were designed to permit Philippine manufacturing of silicon chips and eliminate the need for importing silicone chips from the United States. On the basis of these representations, Philguarantee agreed to guarantee the loan.[1] Philguarantee is a Philippine government agency established to promote the Philippine economy and is limited by its charter to guaranteeing debts of local companies incurred in furtherance of its objectives. Philguarantee agreed to guarantee the loan because the business plan called for the establishment of businesses in the Philippines which would benefit the national economy. After approval of the guarantee, Chuidian changed the business plan and invested the loan proceeds in corporations outside of the Philippines, most significantly Dynetics, Inc. and Interlek, Inc. Philguarantee established at trial that it would not have been authorized nor could it have approved the guarantee if Chuidian would have revealed his plan to use the loan proceeds for foreign stock investments. Subsequently, ARCI defaulted on the loan payments, and Philguarantee was called upon and did make the payments pursuant to the guarantee. The loan diversion was then discovered, and Philguarantee filed suit in the California Superior Court in Santa Clara County against Chuidian, ARCI and the companies in which Chuidian had invested the loan proceeds. Philguarantee argued at the trial that former Philippine president Ferdinand Marcos was a secret partner of Chuidian and a beneficiary of this unauthorized loan diversion, and that when Philguarantee sued Chuidian, Chuidian threatened to expose Marcos' involvement unless Marcos forced Philguarantee to settle the Santa Clara litigation on terms favorable to Chuidian and consequently unfavorable to Philguarantee. The settlement called for Philguarantee to get the stockholdings of ARCI, Dynetics and Interlek in exchange for an irrevocable letter of credit ("the L/C") in Chuidian's favor in the sum of $5.3 million drawn on Philippine National Bank ("PNB"). The Philippine government owns 99.95% of PNB. PNB's principal place of business is in Manila, and it has a branch office in Los Angeles. Philguarantee argued at trial that Dynetics was virtually worthless at the time the settlement agreement was executed. Subsequently, Marcos was expelled from the Philippines, and Philguarantee filed a motion in the Santa Clara

---

1. Central Bank of the Philippines and the Philippine Board of Investments were also required to and did approve the guarantee.

action to vacate the settlement agreement on the ground that it was illegal and was procured by duress and fraud. That motion was denied. Philguarantee appealed that denial, and the California Court of Appeal affirmed the superior court's denial in *Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian*, 218 Cal. App.3d 1058, 267 Cal.Rptr. 457 (1990). As of the date of this opinion, that appellate court ruling is subject to a petition for review by the California Supreme Court. In the meantime, Chuidian had received two payments under the L/C, which called for periodic payments to be made over a number of months at the Los Angeles branch of PNB ("PNB/LA"). When Marcos was expelled, payment on the L/C was frozen by an order issued by the Philippine Commission on Good Government ("PCGG"). In response, Chuidian filed the instant action against PNB for payment of the L/C. Philguarantee intervened and, in addition to arguing that PNB was excused from making payment on the L/C, made the same arguments as it made in the Santa Clara action, i.e. that the Santa Clara action settlement is void due to illegality, duress and fraud, and Philguarantee is entitled to damages for the loan diversion.

## II.  CHUIDIAN v. PNB

It is not disputed between the parties that there was a stop payment issued on the L/C. The evidence is also clear that the L/C was irrevocable. The critical contention is whether any defenses are available to PNB. Both PNB and Philguarantee argue that under California Commercial Code § 5114(2) PNB is excused from payment of the L/C because of fraud in the underlying settlement agreement between Chuidian and Philguarantee regarding the Santa Clara litigation. PNB alone argues that under principles of illegality, international comity and act of state, it is excused from payment of the L/C and cannot be held liable for a breach of contract.

### A.  *Fraud in the Transaction*

■ Both PNB and Philguarantee argue that PNB would be excused from payment of the L/C upon a showing of fraud in the underlying settlement agreement between Chuidian and Philguarantee regarding the Santa Clara litigation. PNB and Philguarantee contend that non-payment of the L/C would be justified by reason of "fraud in the transaction" as set forth in California Commercial Code § 5114(2). The parties agree that there is a split of authority as to which "transaction" § 5114(2) references—the letter of credit transaction or the underlying transaction between the customer (Philguarantee) and the beneficiary (Chuidian). However, the Court need not venture into this unsettled area of law. The Court finds *infra* that there was no fraud in the underlying transaction, and PNB and Philguarantee do not argue that there was fraud in the letter of credit transaction. Thus PNB cannot be excused from making payment on the L/C under § 5114(2).

### B.  *Illegality*

It is well established that illegality or a legal prohibition on performance is a defense to a breach of contract action. *See* California Civil Code § 1511 ("The want of performance of an obligation ... is excused by the following causes ... 1. When such performance or offer is prevented or delayed ... by the operation of law...."); *Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766, 772 (9th Cir.1986) (Under California Civil Code § 1511(1) "[a] party is not required to violate the law to avoid liability for breach of contract.")

The legality of a contract is determined in accordance with the law of the place where the contract is to be performed. While it is true that a foreign government's decree restraining party to a contract cannot excuse a performance to take place in the United States, it will excuse a performance to take place within that government's jurisdiction. 6 A. Corbin, Corbin on Contracts § 1351; Restatement (Second) of Conflicts of Laws § 202; *RSB Manufacturing Corp. v. Bank of Baroda*, 15 B.R. 650, 654–655 (S.D.N.Y.1981); *Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727, 737 (S.D.N.Y.1986).

Thus, the Court must determine (1) where the L/C agreement was to be per-

formed, and (2) if the L/C was to be performed in the Philippines, whether performance is prohibited by Philippine law.

### 1. Place of Performance

■ Other courts have been called upon to determine the place of performance of a letter of credit. *Sabolyk v. Morgan Guaranty Trust Co.,* No. 84 Civ. 3179, 1984 WL 1275 (S.D.N.Y. November 27, 1984) involved a plaintiff who sued Morgan Guaranty in New York for payment of amounts due on irrevocable standby letters of credit issued by Morgan Guaranty in Zurich. Morgan/New York refused payment on the letters of credit after a Swiss Court issued orders of attachment against plaintiffs' interest in the proceeds of the letters. The district court determined that the place of performance was Zurich, not New York. Morgan/New York did not confirm the letters of credit and was not designated in the letters as a paying bank or as a bank authorized to reimburse for any payments made under the letters of credit, the letters were issued by Morgan/Zurich over the signatures of two individuals who were empowered to sign solely on behalf of Morgan/Zurich, collateral was pledged to Morgan/Zurich, Morgan/New York was not identified in the letters of credit or in any amendment thereto as a confirming paying bank or as a participant in the transactions at all, and the letters of credit were shown as a contingent obligation on the books of Morgan/Zurich only. *RSB Manufacturing Corporation v. Bank of Baroda,* 15 B.R. 650 (S.D.N.Y.1981) held that where a Bombay, India branch of the Bank of Baroda issued an irrevocable letter of credit, the bank's use of its New York branch did not extend its undertaking since the New York branch only served in a limited, neutral role of advising and paying. The New York branch never confirmed the credit, and the branch expressly limited its role to that of an advising and paying bank.

In the instant case, Chuidian argues that the fact that the L/C calls for payment to be made at PNB/LA, that two payments were actually made to Chuidian at PNB/LA, that PNB's witnesses admitted that PNB/LA was not a separate bank or entity, that the separation of the obligations of PNB/Manila and PNB/LA was merely an internal matter, and that PNB issued consolidated financial statements for all it overseas operations, compels the conclusion that the L/C was to be performed in Los Angeles. However, the majority of the evidence, considered in light of *Sabolyk* and *RSB,* supports the conclusion that the L/C was to be performed in the Philippines. The letter of credit was issued by PNB/Manila; the negotiations concerning the terms and conditions of issuance of the L/C took place at PNB/Manila's offices; the application for the issuance of the L/C was submitted to PNB/Manila; the L/C provided that "all rights, obligations and liabilities arising hereunder shall be construed according to the laws of the Philippines;" the L/C was approved by the board of directors of PNB in Manila; Amelia Gella, officer-in-charge of PNB/LA, contacted PNB/Manila for authority to remit the two payments made to Chuidian; PNB officers testified that no one at PNB/LA had authority to remit any payments under the L/C without first obtaining approval from PNB/Manila; Boris Kozolchyk, PNB's expert in international letters of credit, testified that PNB/LA's role in the transaction as the designated "paying bank" was nothing more than a "mechanical paymaster" possessed of the least possible amount of authority and discretion; the "sight drafts" specifically provided that PNB/Manila was the "drawee;" the "advice of negotiation" forms completed by PNB/LA after each payment state that each payment was "drawn on Philippine National Bank, Escolta, Manila;" and the L/C was entered as a liability on the books of PNB/Manila but was not entered or carried as a liability on the books of PNB/LA. Accordingly, the Court finds that the place of performance of the L/C was the Philippines at PNB/Manila, and not in Los Angeles.

### 2. Illegal in Philippines

■ Under Executive Order No. 1, the PCGG is vested by the Philippine President with the power to enforce its directives and orders by contempt proceedings. Under Executive Order No. 2, the PCGG is empowered to freeze any and all assets, funds

and property illegally acquired by former President Marcos or his close friends and business associates.

On March 11, 1986, PNB/Manila received an order from the PCGG ordering PNB to freeze any further drawings on the L/C. The freeze order has remained in effect and was followed by a sequestration order issued by the PCGG. Subsequently, Chuidian's Philippine counsel filed a series of challenges to the freeze and sequestration orders, which challenges were unsuccessful as the orders were found valid by the Philippine Supreme Court. The freeze and sequestration orders are presently in effect. Thus, under the PCGG order and Executive Orders Nos. 1 and 2, performance by PNB would be illegal under Philippine law. Therefore PNB is excused from performance of the L/C agreement as long as the freeze and sequestration orders remain in effect.

## C. Comity

■ Courts have generally afforded respect for decisions of foreign judgments and decrees under the principle of comity upon a showing of (1) jurisdiction, and (2) no offense to the forum state public policy. *Sabolyk, supra.* When the acceptance and recognition of the foreign judgment would be contrary or prejudicial to the interest of the nation called upon to give it effect, comity should not be afforded. *See Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971) *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

The Philippine government has jurisdiction over the L/C since PNB/Manila was the issuing bank, the L/C was to be performed in the Philippines (as per discussion above), and the collateral pledged by Philguarantee was in the Philippines.

Next, giving effect to the PCGG orders does not offend the laws or public policy of California or the United States. California Financial Code § 1755(a)(6) provides that a foreign bank "shall not transact any business which it is not authorized to transact or is prohibited from transacting under the laws of its domicile...." Both *Sabolyk*

and *RSB* referenced a similar statute in extending comity to foreign decrees. In addition, federal statutes, such as 18 U.S.C. § 201 et seq., prohibit and provide penalties for graft of the sort which the PCGG orders seek to prevent. Thus the PCGG orders should be recognized under the principle of comity.

## D. Act of State

The doctrine of act of state operates to confer presumptive validity on certain acts of foreign sovereigns by rendering non-justiciable claims that challenge such acts. *Allied Bank International v. Banco Credito Agricola,* 757 F.2d 516, 520 (2nd Cir. 1985). This doctrine is generally applied when the federal courts must question the validity of the acts of a foreign sovereign. *See IAM v. OPEC,* 649 F.2d 1354, 1359 (9th Cir.1981) *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). The doctrine applies where (1) the acts called into question are clearly sovereign in nature, and (2) these acts are done within the foreign country's own territory. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964).

### 1. Sovereign Act

■ The PCGG's orders are acts of a foreign state acting in its sovereign as opposed to its private capacity. The PCGG was empowered to issue the freeze and sequestration orders through the Executive Orders Nos. 1, 2 and 14. Also, the PCGG attempts to attain diverted public, not private, funds. When the state acts in the public interest, its sovereignty is asserted. *IAM v. OPEC, supra* at 1360. Thus, the PCGG's orders are acts clearly sovereign in nature.

Chuidian asserts that the orders cannot be considered sovereign acts because they affect a commercial obligation owed by a foreign state. However, where it is clear that action was taken for a public purpose, the action can be considered sovereign even though it may affect commercial debt or obligations. *See Clayco Petroleum Corp. v. Occidental Petroleum Corp.,* 712 F.2d 404, 408 (9th Cir.1983) *cert. denied* 464

U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *Braka v. Bancomer,* 762 F.2d 222 (2nd Cir.1985). The Ninth Circuit has commented on the commercial activity exception in *IAM v. OPEC, supra* at 1360, wherein it was stated "[t]he act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity."

### 2. Act Done Within Philippines

■ With respect to whether the acts were done within the foreign country's own territory, the Ninth Circuit in *Tchacosh v. Rockwell International Corp.,* 766 F.2d 1333 (9th Cir.1985) used the following test: (1) whether a foreign state has reasonable "expectations of dominion" over the intangible property in dispute based on the contacts between the parties, the intangible property and the foreign state, and (2) whether the foreign government has such a significant interest in dominion over the intangible property that determination of the invalidity of the act of the foreign government by a United States court would be "likely to give offense" to that government. *Id.* at 1338 citing *Sabbatino,* 376 U.S. at 432, 84 S.Ct. at 942.

Chuidian argues that the fact that the L/C was issued pursuant to a settlement in California, that the negotiations for which occurred in California, and that two of the payments were made at PNB/LA, compels the conclusion that the act of prohibiting payment of the L/C occurred in Los Angeles. However, the majority of the evidence and *Tchacosh* and *Sabbatino* compel the opposite conclusion. The L/C was issued in Manila, such was done at the request of a Philippine government instrumentality for the benefit of a Philippine citizen, the L/C was to be performed in the Philippines, all significant events relating to the issuance and implementation of the L/C occurred in the Philippines, the L/C agreement provided that the L/C was to be construed according to laws of the Philippines, and the Philippine government certainly has an interest in preventing the L/C from being remitted in that it would be the release of funds that are potentially illgotten gains. Accordingly, the Court finds that the PCGG orders are acts of state that must be respected by this Court, and thus PNB is excused from making payment on the L/C as long as the freeze and sequestration order remain in effect.

### III. PHILGUARANTEE v. CHUIDIAN

Philguarantee requests the Court to determine if the Santa Clara litigation settlement agreement is illegal or was procured by duress or fraud and, if so, to vacate that stipulated judgment and grant Philguarantee affirmative relief against Chuidian for loan diversion.

### A. Authority to Set Settlement Aside

■ First, this Court must decide whether it has the authority or obligation to vacate a state court stipulated judgment upon a showing of illegality, duress or fraud. Many federal courts have held that they have the authority to vacate a judgment entered by a state court. See, *Griffith v. Bank of New York,* 147 F.2d 899, 901 (2nd Cir.1945) ("[I]t is well settled that the federal courts may exercise their equity powers so as to set aside, enjoin enforcement of, or ignore a state court judgment obtained by fraud."); *Mortensen v. Alcoa S.S. Co.,* 101 F.Supp. 228, 229 (S.D.N.Y. 1951) ("[T]he Federal Courts have equity powers which may be exercised in the proper case to set aside, enjoin enforcement of, or ignore a state court judgment obtained by fraud."); *Wohl v. Keene,* 476 F.2d 171 (4th Cir.1973) (Abstention by federal court was improper regardless of whether plaintiffs had a plain, adequate and complete remedy in the state equity court which rendered the prior decree.). On the other hand, other federal courts have found that they should not rule upon the validity of a state court judgment if an adequate remedy exists in the state court system. See, *Lapin v. Shulton, Inc.,* 333 F.2d 169, 172 (9th Cir.1964) ("We need not go so far as to hold that these considerations and this interpretation of Rule 60(b) deprive all courts other than the issuing court of jurisdiction in such a case as this. We do hold that considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction of

such an action and remand the parties for their relief to the rendering court, so long as it is apparent that a remedy is available there."); *M.W. Zack Metal v. Intern. Nav. Corp. of Monrovia*, 675 F.2d 525, 529 (2nd Cir.1982) ("[Plaintiff] had an opportunity to raise these fraud claims in the courts in which they occurred and, therefore, cannot maintain this independent action for fraud. [¶] An independent action for fraud may not be entertained if 'there was an opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action.' "); *Osterling v. Commonwealth Trust Co. of Pittsburgh*, 35 F.Supp. 704, 705–706 (W.D.Penn.1940) ("If the orders of the state court were obtained by fraud, that fraud cannot cause a transfer of the jurisdiction at this time.... [¶] [P]laintiff has cited certain cases which declare that concurrent actions may be maintained in a [state] court and a Federal court where only a money judgment is sought in the latter. We can conceive of circumstances under which two courts may each maintain an action upon the same issues, but not under those now confronting us. It must be remembered that the [state] court first assumed jurisdiction of the matters raised by the Complaint, that the plaintiff and his predecessor in title submitted themselves to its jurisdiction in the disposition of the issue, and that that court has rendered judgment. The situation being thus, this court cannot go behind the judgment. To do so would be tantamount to a baseless claim of appellate power over the judgments of the [state] court.").

Professor James Moore is of the opinion that federal courts should not entertain actions to vacate state court stipulated judgments allegedly procured by fraud if the state court system provides an adequate remedy. Professor Moore states in 7 Moore, *Moore's Federal Practice*, ¶ 60.36, p. 60–366–60–367, "The authority of a federal court to entertain an independent proceeding for relief from a state court judgment is supported by a long line of older authorities, [footnote] although in view of the Anti–Injunction Act (28 USC § 2283), the continuing validity of this authority is

in question. [footnote]" Professor Moore goes on to state at ¶ 60.37[3], p. 60–393,

> prior to *Erie* it was generally stated that the aggrieved party could invoke the federal remedy, by an original action brought in the federal court, without first pursuing the remedy provided by state procedure. [footnote] Insofar as this doctrine permits resort to the federal court in situations where an independent action would lie in the state court it is sound; [footnote] but we believe it should be re-evaluated insofar as it permits the federal court to disregard the adequacy of the state remedy for relief by motion or other supplementary proceedings in the state court which rendered the judgment. If the supplementary state remedy is not a plain, adequate and complete remedy then resort to the independent action in the federal court seems eminently proper. [footnote] If, on the other hand, the state supplementary remedy is plain, adequate and complete, we believe ... that an appropriate regard for state judicial administration should normally cause the federal court, in the exercise of sound discretion, to refuse to exercise its equitable powers. [footnote] There is some *contra* authority, however. [footnote]

In the instant case, Philguarantee moved the Santa Clara Superior Court to set aside the stipulated judgment on the ground that it is illegal and was procured by duress and fraud. The Superior Court denied that motion. Philguarantee appealed that denial, and the appellate court affirmed in *Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian*, 218 Cal.App.3d 1058, 267 Cal.Rptr. 457 (1990). As of the date of this opinion, these decisions are subject to a petition for review by the California Supreme Court. Philguarantee also intervened in this action and is requesting this Court to set aside the stipulated judgment.

After considering the foregoing, the Court finds that it should proceed to determine if the Santa Clara litigation settlement agreement is illegal or was procured by duress or fraud. The Court is aware of its duty to provide relief to those who have

been wrongfully injured and are properly before the Court, and will not shirk this responsibility. The fear of issuing a ruling inconsistent with a state court ruling is not present here because a finding of fraud by this Court would not be inconsistent with a failure to find fraud by the state court (or vice versa) in that different factual presentations may have been made to the courts resulting in different decisions. Res judicata and/or collateral estoppel does not bar this Court from ruling on the issue because the appellate court decision is presently subject to a petition for review by the California Supreme Court. See, *Ray v. Hasley*, 214 F.2d 366 (5th Cir.1954); *People v. Mitchell Bros. Santa Ana Theater*, 101 Cal.App.3d 296, 306, 161 Cal.Rptr. 562 (1980). The doctrine of abstention to avoid duplicative litigation is not applicable at this point in time because all litigation in this matter has already been conducted. Thus, the Court finds no reason why it should not rule on validity of the Santa Clara settlement.

### B. Analysis

Philguarantee argues that the settlement agreement must be set aside as void and unenforceable because it is illegal and was procured through duress and fraud.

#### 1. Illegality

■ Philguarantee cites *Williamson v. Superior Court*, 21 Cal.3d 829, 839, 148 Cal.Rptr. 39, 582 P.2d 126 (1978), *Allen v. Jordanos' Inc.*, 52 Cal.App.3d 160, 166, 125 Cal.Rptr. 31 (1975), and *Hare v. McGue*, 178 Cal. 740, 741, 174 P. 663 (1918), which hold that an agreement to suppress evidence or to conceal discreditable facts, or an agreement to testify in a certain manner, is illegal and therefore void in California. Philguarantee offered evidence that Chuidian agreed to conceal the fact that Marcos was involved with Chuidian in the ARCI loan diversion in exchange for Marcos' efforts to cause Philguarantee to execute the settlement agreement. However, any illegality in the agreement between Marcos and Chuidian does not affect the validity of the settlement agreement between Chuidian and Philguarantee. En-

forcement of the allegedly illegal agreement between Marcos and Chuidian is not at issue here. Rather, a completely separate agreement is at issue which is not alleged to involve illegal consideration. The fraud allegedly perpetrated upon Marcos cannot be imputed to Philguarantee because it is well established that a foreign government is presumed separate and distinct from its instrumentalities, and that two instrumentalities of a foreign government are presumed separate and distinct, which presumption is overcome only where the instrumentality is so controlled that a relationship of principal and agent is created, or where giving force to the presumption would allow the government to work a fraud or injustice. *First National City Bank v. Banco Para El Comercio*, 462 U.S. 611, 623–630, 103 S.Ct. 2591, 2598–2602, 77 L.Ed.2d 46 (1983); *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 294 (S.D.N.Y.1987); *Hercaire International Inc. v. Argentina*, 821 F.2d 559, 564 (11th Cir.1987). Here, the evidence showed that Philguarantee was not controlled by Marcos but rather that Philguarantee executed the settlement agreement only after the Philguarantee board thoroughly discussed and considered the terms of the settlement and the profitability of Interlek and Dynetics. Nor would giving force to the presumption of independent status allow the Philippine government to work a fraud or injustice in that it is the Philippine government that has allegedly been defrauded. Thus, Philguarantee's argument that the allegedly illegal agreement between Marcos and Chuidian invalidates the settlement agreement between Chuidian and Philguarantee is without merit.

■ In addition, the agreement to suppress evidence in the instant case is not of the type the courts deem illegal. In *Williamson, supra*, the court held that an attempt to suppress expert witness testimony relevant to the action itself was illegal. In *Allen, supra*, the court held that an agreement between a former employee and his employer whereby the employer agreed to refrain from disclosing to the government agency responsible for dispers-

424

ing unemployment benefits that the employee had been fired for misconduct and therefore was not eligible for unemployment benefits, was illegal where the employer was obligated by statute to disclose such information. The instant agreement is of a much different sort than the agreements in *Williamson* and *Allen.* Here, Philguarantee attempted to prove that Chuidian agreed not to disclose information regarding Marcos' involvement with the ARCI loan diversion. That information was of political significance to Marcos, but was not legally relevant to Philguarantee's action against Chuidian. Nor was Chuidian obligated by law to disclose that information. Many lawsuits are settled for the sole purpose of avoiding the public disclosure of embarrassing or private information. Such is not illegal because it does not call for the suppression of evidence at a trial or proceeding, but rather is merely a motive behind settling the dispute. The instant case is such a situation.

■ The settlement agreement also recites that Chuidian would not be held liable for any criminal offense under Philippine law. It is well settled that an agreement to refrain from criminal prosecution is illegal and unenforceable. *Bowyer v. Burgess,* 54 Cal.2d 97, 100, 4 Cal.Rptr. 521, 351 P.2d 793 (1960). This provision in the settlement agreement appears to be an agreement not to prosecute and thus illegal. However, this does not render the entire settlement void. Where the consideration is only partly illegal and the agreement is severable, the legal portion may be enforced. In other words, if the contract has several distinct objects, of which at least one is lawful, the contract is valid and enforceable as to the lawful object, provided that this is clearly severable from the rest. *Pitts v. Highland Construction Co.,* 115 Cal.App.2d 206, 212, 252 P.2d 14 (1953); 1 Witkin *Summary of California Law,* 8th ed., p. 289 § 342. Here, the recitation that Chuidian would not be liable for any criminal offense under Philippine law is only one provision of many in the settlement agreement. Considering that it is the only illegal portion of the agreement, and that the agreement contains numerous other

provisions not specifically tied to this one, the Court finds that this portion of the agreement is severable and does not render the entire settlement agreement void.

### 2. Duress

■ Philguarantee cites *In re Marriage of Gonzalez,* 57 Cal.App.3d 736, 129 Cal. Rptr. 566, 570 (1976), which holds that a contract obtained by so oppressing a person by threats regarding the safety or liberty of himself, or of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the grounds of duress. Philguarantee offered evidence that Chuidian threatened to expose Marcos' involvement in the ARCI loan diversion unless Marcos would cause Philguarantee to settle. Again, however, Philguarantee does not argue that duress caused it to enter into the settlement agreement; rather, Philguarantee argues that the agreement between Chuidian and Marcos, allegedly tainted by duress, invalidates the agreement between Chuidian and Philguarantee. The fact that the agreement between Chuidian and Marcos may have been tainted by duress does not affect the validity of the settlement agreement between Chuidian and Philguarantee. *First National City Bank, supra; Baglab Ltd., supra.* Thus, Philguarantee's argument that the settlement agreement is invalid because of the presence of duress in the agreement between Chuidian and Marcos is without merit.

In addition, there is evidence that the terms of the settlement were quite thoroughly discussed by the Philguarantee board prior to execution, and that the settlement was somewhat commercially advantageous to Philguarantee. Such refutes the idea that the settlement was procured by duress. In exchange for dismissing the action, Philguarantee received the stock of ARCI and Interlek, and part of the stock of Dynetics. Chuidian offered evidence that the Philguarantee board studied the profitability of these companies, and discussed and considered the terms of the

settlement, prior to agreeing to the settlement. Philguarantee argues that Dynetics was virtually worthless within two months after the settlement was executed. However, there is evidence that the other companies were of substantial value at the time of settlement, and that Philguarantee analyzed the profitability of these companies before settling. In view of these facts, the Court fails to find that the settlement was procured by duress.

### 3. Fraud

Philguarantee cites *In re Marriage of Stevenot*, 154 Cal.App.3d 1051, 1068, 202 Cal.Rptr. 116 (1984), which explains that fraud has been interpreted to include situations where the unsuccessful party was "kept in ignorance or in some other manner, other than from their own conduct, fraudulently prevented from fully participating in the proceedings," and *In re Marriage of Park*, 27 Cal.3d 337, 342, 165 Cal. Rptr. 792, 612 P.2d 882 (1980), which explains that fraud has been interpreted to "encompass almost any set of extrinsic circumstances which deprive a party of a fair adversary hearing." Again, Philguarantee argues that the fraud allegedly perpetrated upon Marcos by Chuidian invalidates the agreement between Chuidian and Philguarantee. As shown above, this argument is meritless. *First National City Bank, supra; Baglab Ltd., supra.* Philguarantee also argues that Chuidian and Marcos conspired to and did jointly perpetrate a fraud on Philguarantee. However, the evidence shows that Philguarantee executed the settlement only after the terms of the settlement were thoroughly considered and discussed by the Philguarantee board and the profitability of Interlek and Dynetics was analyzed. Thus, even if a conspiracy between Marcos and Chuidian to defraud Philguarantee were shown, actual perpetration of a fraud on Philguarantee is not shown. Accordingly, the settlement cannot be set aside on the ground that it was procured by fraud.

ACCORDINGLY,

JUDGMENT IS HEREBY RENDERED (1) in Philippine National Bank's favor on Vicente Chuidian's action against Philippine National Bank for payment of the letter of credit, and (2) in Vicente Chuidian's favor on Philippine Export and Foreign Loan Guarantee Corporation's action to set aside the settlement agreement between Vicente Chuidian and Philippine Export and Foreign Loan Guarantee Corporation.

Each party is to bear its own attorneys' fees and costs.

IT IS SO ORDERED.