ENGEL INDUSTRIES, INC., Plaintiff,

v.

FIRST AMERICAN BANK, N.A.,
Defendant and Third–Party
Plaintiff.

MEDCON ENTERPRISES, INC.,
Defendant and Third–Party
Plaintiff,

v.

Khaled Faisal al HEGELAN, and
UBAF Arab American Bank,
Third–Party Defendants.

Civ. A. No. 91–1496.

United States District Court,
District of Columbia.

June 2, 1992.

Jane Cohen, Susman, Schermer, Rimmel & Shifrin, St. Louis, Mo., Mark A. Cymrot, William P. McGrath, Jr., Cole, Corette & Abrutyn, Washington, D.C., for plaintiff Engel Industries, Inc.

Stanley J. Marcuss, Philip T. von Mehren, Milbank, Tweed, Hadley & McCloy, Washington, D.C., for defendant 1st American Bank, N.A.

Anthony D. Padgett, Thelen, Marrin, Johnson & Bridges, Washington, D.C., for defendant Medcon Enterprises, Inc.

K. Chris Todd, Johnson & Gibbs, Washington, D.C., Michael E. Norton, Porter & Travers, New York City, for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

Plaintiff Engel Industries ("Engel") brought this action seeking damages for a commercial transaction that broke down as a result of the onset of hostilities between the United States and Iraq. Plaintiff had a contract to sell equipment to defendant Medcon Enterprises ("Medcon") which was in turn intending to sell the equipment to an Iraqi government agency. Defendant Medcon arranged to pay for the purchase with an irrevocable letter of credit issued by defendant First American Bank ("First American") in favor of the plaintiff. Plaintiff is suing First American Bank for failing to honor the letter of credit. Plaintiff is also suing Medcon Enterprises for breach of contract.

The action has become procedurally complex since the filing of the initial complaint. Medcon Enterprises and First American Bank have brought third-party actions against an individual, Khaled Faisal Al Hegelan, and a bank, UBAF Arab American Bank, who were to provide payment to defendants Medcon and First American Bank on behalf of the Iraqi government agency that was ultimately purchasing plaintiff's equipment. Defendant First American has also filed a cross-claim against defendant Medcon Enterprises. Finally, defendant Medcon Enterprises has filed a counterclaim against Engel seeking return of a downpayment.

Cross-motions for summary judgment on the original complaint are currently pending before the Court. As no genuine issue of material fact remains to be decided, the Court is now prepared to rule on these motions. *See Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## I. FACTS

Plaintiff Engel is in the business of manufacturing various types of heavy machinery. Defendant Medcon contacted Engel to inquire whether Engel would be interested in a contract to manufacture machinery used for the roll forming of steel. Medcon told Engel that the machinery was to be used in Iraq in a plant that was going to manufacture air conditioning equipment. Engel expressed interest in Medcon's proposal, and proceeded to participate in discussions with the Iraqi purchasers. Engel and Medcon arranged a transaction wherein Engel was to sell the roll forming machinery to Medcon which would in turn sell it to the Iraqi purchasers. On May 23, 1990, Engel and Medcon signed a contract (Purchase Order EI 001) committing themselves to the deal. After the contract was signed, Medcon opened a letter of credit at First American Bank in favor of Engel for $272,103.00. Mercantile Bank in St. Louis, Missouri, where Engel is based, served as advising bank. The letter expired on September 30, 1990. By the terms of the letter, when Engel completed general assembly drawings, it was entitled to draw a downpayment of 10% of the amount of the letter of credit ($27,210.30). Engel was to deliver the machinery FOB its factory in St. Louis Missouri, loaded into containers suitable for shipping and marked with labels showing the destination in Iraq no later than August 24, 1990. Engel was required to present the documents to Mercantile Bank proving that the goods had been delivered and was to receive the balance of the letter of credit in return. The transaction did not go according to plan.

Engel completed the general assembly drawings and drew its downpayment on July 27, 1990. Then, on August 2, 1990,

President Bush exercised his powers under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 et seq., and imposed a freeze on all Iraqi assets in the United States. *See* Executive Order 12722, 55 Fed.Reg. 31803 (Aug. 3, 1990); Executive Order 12724, 55 Fed.Reg. 33089 (Aug. 13, 1990). Shortly thereafter, on August 8, 1990, Medcon wrote Engel:

> In compliance with the President's Executive Order and because of the underlying force majeure events beyond our control, Medcon Enterprises, Inc. must and hereby does withdraw, cancel and rescind Purchase Order EI 001.... You should advise your bank to return all original Letter of Credit documents to the issuing bank for cancellation.

*See* Exhibit D, Plaintiff Engel Industries' Motion for Summary Judgment. Then on August 14, 1990, First American wrote to Engel and stated:

> In light of the terms of the underlying trade transaction relating to Iraq and the Central Bank of Iraq letter of credit, we regret to advise you that First American Bank, N.A. is prohibited by these Executive Orders from making payment under its Letter of Credit No. ID–43720 at this time.

*See* Exhibit 3, Complaint. First American sent an almost identical letter to Mercantile Bank dated August 16, 1992. Despite the information it received from Medcon and First American, Engel continued its performance under the contract and the letter of credit. On August 2, when Engel first received word from Medcon to halt the project, it had substantially completed its performance. The only things left to be done were the painting and crating of the equipment. *See* Exhibit N, Plaintiff Engel Industries' Motion for Summary Judgment (Affidavit of Michael Zimmer). It finished manufacturing Medcon's order and was ready to perform as required under its contract with Medcon. It had the necessary documents prepared to present to Mercantile in order to receive payment on the letter of credit. *See* Exhibit O, Plaintiff Engel Industries' Motion for Summary Judgment (Affidavit of Shirley Boerngen). However, on August 24 when Engel called

Mercantile Bank to make arrangements to present the documents, Mercantile informed Engel that it would not accept the documents. That day Mercantile Bank wrote to Engel as follows:

> As stated in this letter [we received from First American], First American will not remit payment for documents presented; therefore, at this time Mercantile Bank of St. Louis will be unable to assist you in the handling of the documentation.

*See* Exhibit 4, Complaint. Finally, on August 29, 1990, First American sent a letter to Engel demanding return of the downpayment.

In an effort to mitigate damages, plaintiff began to sell some of the machinery. It sold the first piece on August 28, 1990 after it was barred from presenting its documents. *See* Affidavit of Michael Zimmer in Support of Plaintiff Engel Industries, Inc.'s Motion for Summary Judgment (filed separately). It sold more during the next months. Plaintiff was able to recoup some funds from these sales but it also lost significant amounts in costs of disassembly and repacking as well as lost interest. Plaintiff seeks $148,000 in damages for the losses it suffered. Defendant Medcon has filed a counterclaim to recoup the downpayment it gave to Engel, via First American. First American has filed a cross claim against Medcon seeking indemnification for anything it is held to owe Engel.

## II. LEGAL ANALYSIS

At present, only the cross motions for summary judgment filed by Engel and First American are ripe. The Court will proceed to decide these motions.

### A. IMPACT OF THE FREEZE

The impact of the freeze that President Bush imposed on Iraqi assets is a central question in this case. The defendants contend that they will violate the law if they pay Engel. Therefore, they claim they are excused from performance. At the request of the Court, the parties sought the opinion of the Office of Foreign Assets Control (OFAC) on the question of whether the

freeze of Iraqi assets legally prohibited Medcon and First American from paying Engel under the letter of credit. OFAC sent a letter to the parties on January 30, 1992 giving its opinion.

OFAC begins by noting that when a freeze is initiated, it must create "the broadest possible embargo" in order to be effective. However, it then states that this sweeping interpretation "may then be fine-tuned by interpretations, specific and general licenses when the nature and relative importance of various types of Iraqi property and transactions with Iraq have been assessed." The letter then goes on to analyze the transaction in question under the regulations which implement the freeze.[1] OFAC stated in reference to the Medcon/Engel contract:

> First, Engel may sell the goods to a third party to mitigate its damages. Second, Engel may retain the goods as blocked property. Finally, Engel may transfer the goods to Medcon by consent or contractual right, if any.

As far as the letter of credit is concerned, OFAC stated that the freeze never prevented presentment or acceptance of documents. Also, even before the regulations were implemented when the status of the transaction was less clear, First American always retained the option of applying for a specific license from OFAC so that it could pay Engel. OFAC concluded that under the current regulations:

> OFAC would treat the financing agreement for the Medcon–Engel contract as incidental to a domestic transaction in unblocked property, and would permit payment by First American upon a court finding that all L/C [letter of credit] conditions to payment by First American were complied with.

The Court accepts OFAC's opinion. While Medcon and First American reasonably assumed their dealings with Engel were af-

fected by the freeze, they erroneously concluded that it was impossible for them to perform at that time or any other. The Iraqi freeze does not currently nor did it ever prohibit the defendants in this case from meeting their obligations under the Medcon/Engel contract or under the letter of credit. Beginning with this information, the Court will proceed to consider the rights of the parties under the contract and the letter of credit.

**B. ANTICIPATORY BREACH OF THE MEDCON/ENGEL CONTRACT**

■ Legal issues arising under the contract between Medcon and Engel are governed by Missouri law because Missouri was the place the contract was made and the place where it was to be performed. *See Nepera Chemical, Inc. v. Sea–Land Service Inc.*, 794 F.2d 688, 695 (D.C.Cir. 1986). The Uniform Commercial Code is in force in Missouri and controls this case. Under UCC section 2–610, Medcon's letter to Engel of August 8, 1990 constituted an anticipatory breach. *See* Mo.Rev.Stat. § 400.2–610. Medcon clearly stated its intent not to perform under the contract at that time or any other time. Medcon lacked a valid legal basis for reaching this extreme conclusion. Engel exercised its statutory rights when it continued to perform and then resold the goods when Medcon failed to retract its repudiation. *See* Mo.Rev.Stat. §§ 400.2–610, 400.2–703. Engel is therefore entitled to damages.

■ Medcon claims that it was excused from performance because of commercial impracticability. *See* Mo.Rev.Stat. § 400.2–615. This doctrine does not apply to Medcon because it was not commercially impracticable for it to pay Engel. Any bar to payment was temporary. However, Medcon made no effort to determine that fact at the time.[2] It never notified Engel

---

**1.** The Office of Foreign Assets Control administered the freeze by issuing licenses until it could issue regulations. The regulations went into effect January 18, 1991. *See* 31 C.F.R. Part 575.

**2.** Medcon has not presented the Court with any legal opinions or other advice that it sought at the time the freeze was imposed. The evidence

shows that Medcon did not contact OFAC for more than eleven months after the freeze was ordered, and even then it only got informal advice. *See* Exhibit 6, Defendant Medcon's Motion to Dismiss (Affidavit of Anthony Padgett). It appears that Medcon reached the conclusion that the freeze absolutely prohibited payment

of the problem it believed the freeze created nor did it give Engel an opportunity to modify the contract as parties are required to do under UCC section 2–616 in cases of commercial impracticability. *See* Mo.Rev. Stat. § 400.2–616. Instead, Medcon unilaterally determined that it could not perform and repudiated the contract. Medcon anticipatorily breached its contract with Engel and must pay the damages Engel incurred.

## C. ANTICIPATORY BREACH OF THE LETTER OF CREDIT

■ The letter of credit says on its face that it is governed by the Uniform Customs and Practice for Documentary Credits (rev. ed. 1983). The UCP does not address the problem which arose in this case: anticipatory breach. Contrary to what First American contends, Article 19 of the UCP does not excuse performance under a letter of credit where circumstances have created a supervening illegality. The plain language of Article 19 indicates that it is meant to cover those times when uncontrollable acts stop the bank from doing business altogether, e.g. hurricanes, wars and computer failures.[3] Even where the parties have chosen to subject themselves to the UCP, Courts still look to other applicable law to govern the transaction. *See* D.C.Code § 28:5–102(1)(a); *Banco di Roma v. Fidelity Union Trust Company*, 464 F.Supp. 817, 820 (D.N.J.1979). Only in a few states that have modified the UCC must the Court defer entirely to the UCP when there is a conflict. *See Consolidated Aluminum Corp. v. Bank of Virginia*, 544 F.Supp. 386, 400 (D.Md.1982).[4] The Uniform Commercial Code directly addresses anticipatory breach of letters of credit in section 5–115 and can therefore provide a relevant standard in this case. *See* D.C.Code § 28:5–115.

■ When First American wrote to both Engel and Mercantile, the advising bank, and stated its intention not to pay on the letter of credit, its actions constituted an anticipatory breach. *See Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314 (2d Cir.1985). First American claims that it was only giving Engel notice of a supervening illegality, but the facts belie that contention.

First American not only wrote to Engel, it wrote the advising bank and said that it would not pay under any circumstances, thereby indicating to its agent, *see Sound of Market Street, Inc. v. Continental Bank International*, 819 F.2d 384, 388 (3d Cir.1987) (advising bank is agent of issuing bank), that documents could not be accepted. Mercantile then carried out First American's wishes and advised Engel that it could not "assist . . . in the handling of the documentation." Engel notified First American that Mercantile had prevented presentation on September 11, 1990, before the letter of credit expired. *See* Exhibit I, Engel Industries' Motion for Summary Judgment. If First American wished to correct any errors on Mercantile's part, they had the opportunity. Engel was never notified that documents would be accepted. First American's letters did not simply give notice, they blocked Engel's further performance by impeding the presentation of documents.

---

from August, 1990 forward without careful research.

**3.** Article 19 reads as follows:

Banks assume no liability or responsibility for consequences arising out of the interruption of their business by acts of God, riots, civil commotions, insurrections or any other causes beyond their control, or by any strikes or lockouts. Unless specifically authorized, banks will not, upon resumption of their business, incur a deferred payment undertaking, or effect payment, acceptance or negotiation under credits which expired during such interruption of their business.

**4.** In New York, the UCC has been modified to state explicitly that where the parties choose to apply the UCP, it will be applied instead of the general provisions of the UCC. *See Sound of Market Street, Inc. v. Continental Bank International*, 819 F.2d 384, 388 (3d Cir.1987). In other states, including the District of Columbia where this letter of credit was opened, the UCC makes no special accommodation to the UCP. *See* D.C.Code. § 28:5–102; *Atari, Inc. v. Harris Trust and Sav. Bank*, 599 F.Supp. 592, 600 (N.D.Ill. 1984). The UCP is applied in conjunction with the UCC. *See generally*, John F. Dolan, *The Law of Letters of Credit* ¶ 4.05 (1991).

By its own submissions, First American has shown that it questioned whether the freeze prevented it from paying on the letter of credit only after it had already repudiated the letter of credit. On September 24, 1990 First American first wrote the Office of Foreign Assets Control seeking guidance on whether it was permitted to make payment under the letter of credit.[5] *See* Marcuss Affidavit, Exhibit C, Defendant's Cross Motion for Summary Judgment. First American was acting without any guidance from OFAC when it wrote Engel on August 14 declaring that payment under the letter of credit was illegal. First American acted in haste and without sufficient legal justification when it wrote Engel. First American's letter to Engel was not a simple notice of the freeze or of what First American tentatively believed to be its impact on the letter of credit. It was a repudiation.

There was no act that excused First American from completely discharging its obligation under the letter of credit. Simply put, the freeze never created an absolute bar to First American's performance. Whatever legal force the freeze had, it was only temporary in nature. Moreover, First American always had available to it the right to seek an exception to the freeze by applying to OFAC for a license. What is more, once the regulations were in place, it became clear that First American could pay under the letter of credit as long as the terms had been satisfied. Unlike the case of *Chuidian v. Philippine National Bank*, 734 F.Supp. 415 (C.D.Cal.1990), First American never received any specific orders instructing it to freeze its letter of credit.[6] In August of 1990, the freeze was issued in broad terms with the understanding, as OFAC noted in its January 30, 1992 letter, that specific cases would be addressed through licenses and regulations. It was obvious from the record that First American wanted an excuse not to

perform its solemn undertaking to pay under its letter of credit. Instead of doing everything it could to meet its obligation under the letter, First American took the opposite tack, namely to find or manufacture every excuse possible to avoid compliance with its responsibilities. That is not the way a financial institution should respond in this very important area because in doing so, it does considerable damage to the acceptability of letters of credit for effecting complex transactions in the business world.

Engel performed its obligations, and it was entitled to get the benefit of its performance. First American's key argument is that it was excused from performance under the letter of credit because Engel did not make presentment as required by the letter of credit. Under the circumstances of this case, First American is estopped from demanding that Engel present documents in order to receive payment. *Cf. Crocker Commercial Services v. Countryside Bank*, 538 F.Supp. 1360, 1363 (N.D.Ill.1981) (bank estopped from raising objections to documents when objections not made before letter of credit expired). First American repudiated the letter of credit before it expired, indicating to Engel that any presentation would be futile. Moreover, when Engel sought to preserve its rights and tried to perform its obligations under the letter of credit, First American prevented Engel from making presentation until the letter of credit expired. There is undisputed evidence that Engel was prepared to make presentation, that it had delivered the goods FOB its warehouse, and that presentation was not made only because First American's agent, the advising bank, would not accept presentment.

This case is analogous to *Kelley v. First Westroads Bank*, 840 F.2d 554 (8th Cir. 1988). In *Kelley*, a court had issued a temporary restraining order preventing the

---

**5.** First American wrote again on October 15, 1990. *See* Marcuss Affidavit, Exhibit C, Defendant's Cross Motion for Summary Judgment.

**6.** In *Chuidian*, the Philippine government agency responsible for imposing the freeze on all

assets illegally acquired by former President Marcos sent an order to the issuing bank telling it to freeze any further drawings under the specific letter of credit at issue in the case. *See* 734 F.Supp. at 420.

issuing bank from paying on the letter of credit. By the time the temporary restraining order was lifted, the letter of credit had expired. The appeals court upheld the order requiring the bank to honor the letter of credit despite the fact that it had expired. The temporary restraining order was viewed as holding payment in suspension. The freeze should be viewed in the same way. It held First American's duty to pay in suspension until a decision could be made on the legality of payment. First American's duty to pay was fixed on August 24, 1990 when Engel had the documents ready and they were denied any opportunity for presentment.

It is obvious that beneficiaries of letters of credit cannot be allowed to collect without first meeting all of their obligations. Without a rule of strict compliance, letters of credit would not serve their purpose as a financing mechanism, but to honor First American's defense would be to carry the concept of strict compliance to an extreme. In this case, Engel has complied with its obligations including the preparation of necessary documents as shown by the undisputed evidence it has presented. First American cannot now prevail by claiming that Engel failed to do something First American *specifically blocked* Engel from doing.[7] Even if First American had been correct about the impact of the freeze, at the most it was only temporarily prohibited from making payment under the letter of credit. First American could have taken the documents and withheld payment until such time as it was licensed or otherwise authorized to make payment. Since OFAC has now indicated that the freeze does not prevent First American from accepting presentation of the documents, Engel must prevail on its claim. *See* Exhibit A, Defendant First American Bank's Cross–Motion for Summary Judgment Against Plaintiff

Engel Industries, Inc. (OFAC letter dated January 30, 1992).

Letters of credit serve an extremely important purpose in the commerce of this nation and indeed the world. They facilitate complex commercial transactions by assuring parties like Engel that they will be paid if they complete their performance under contracts that they make. As one expert in the field of commercial transactions has written:

> Support for credit in commercial transactions has been the lifeblood supplied by financial institutions such as banks.... Without the involvement of a financial institution on the side of the purchaser, the seller assumes a serious risk that the purchaser of goods or services might not be able to meet the obligation on the underlying transaction. That risk also creates an uncertainty of repayment itself with the burden of disposing of its collateral in a market with which it is unfamiliar and in which it has no expertise.

Egon Guttman, *Bank Guarantees and Standby Letters of Credit: Moving Toward a Uniform Approach,* 56 Brooklyn L.Rev. 167–8 (1990). In many instances, letters of credit simplify and facilitate transactions by making them feasible and economical. By assuring entrepreneurs the benefits of their bargains, business speculators who are otherwise unknown to each other are able to enter into contracts with the confidence they will be executed to the satisfaction of the parties. To permit a letter of credit to be repudiated as was done here would strongly inhibit the use of this very important instrument and could force businesses to engage in exhaustive credit investigations and otherwise devise needlessly complex and prohibitively expensive financing arrangements. If reputable financial institutions are able to weasel out of their obligation under their

---

**7.** First American by its actions has given "chutzpah" a new definition. Chutzpah is defined in *The Joys of Yiddish* as "Gall, brazen nerve, effrontery, incredible 'guts,' presumption-plus-arrogance such as no other word, and no other language, can do justice to." Leo Rosten, *The Joys of Yiddish* 93 (1968). It goes on to state that "Chutzpah is a quality enshrined in a

man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan." *Id.* Here First American first states it will not honor its letter of credit and then uses as an excuse not to honor its obligation, the fact that Engel did not present its papers as required by the letter of credit.

**16**

letters of credit, they will do a great disservice to business in this country and will also reduce their own profits. Letters of credit are too important a form of financing to permit them to be so easily repudiated with such finality as summarily happened in this case. Engel certainly would not have entered into this international transaction without the benefit of a letter of credit or its equivalent.

The Court trusts that this opinion will provide guidance to the parties on the resolution of the remaining claims. They should notify the Court immediately of any agreement they reach. If the parties are unable to resolve the remaining claims within twenty days, they are to notify the Court of how they want to proceed.

An appropriate order accompanies this opinion.

### ORDER

For the reasons given in the foregoing opinion, it is this 2nd day of June hereby

ORDERED that plaintiff Engel Industries' motion for summary judgment is granted. Judgment shall be entered in favor of the plaintiff in the amount of $148,-000 with appropriate set-offs, if any; and it is

FURTHER ORDERED that the cross-motion for summary judgment of defendant Medcon Enterprises is denied; and it is

FURTHER ORDERED that the cross-motion for summary judgment of defendant First American Bank is denied; and it is

FURTHER ORDERED that within twenty days of the date this order is entered the parties are either to inform the Court of how they have resolved the claims remaining in the case or to file with the Court a statement of how they want to proceed with the remaining claims.