976 F.2d 561
 18 UCC Rep.Serv.2d 1006
 Vincente B. CHUIDIAN, Plaintiff,
and
Robert M. Damir, Trustee in Bankruptcy, Appellant,
v.
PHILIPPINE NATIONAL BANK, et al., Defendants-Appellees.
Philippine Export and Foreign Loan Guarantee Corporation, Intervenor.
 No. 90-56031.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 8, 1992.
Decided Oct. 1, 1992.
As Amended Dec. 11, 1992.
 
 Steven C. Finley, McKenna & Fitting, San Francisco, Cal., Vincente B. Chuidian, Hillsborough, Cal., for plaintiff-appellant.
 Joanne M. Frasca, Jones, Day, Reavis & Pogue, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before FARRIS, WIGGINS and FERNANDEZ, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 Robert Damir, trustee in bankruptcy for Vincente Chuidian, appeals the district court's judgment, following a bench trial, in favor of Philippine National Bank in Chuidian's action on a letter of credit. We affirm.
 
 
 2
 * The underlying facts are set forth in Chuidian v. Philippine National Bank, 912 F.2d 1095 (9th Cir.1990) (Chuidian I ):
 
 
 3
 Chuidian owns interests in various businesses in California. In 1985, the Philippine Export and Foreign Loan Guarantee Corporation ..., an instrumentality of the Republic of the Philippines government under then-President Ferdinand Marcos, sued several of Chuidian's companies in Santa Clara Superior Court. Chuidian counterclaimed. The parties settled the Santa Clara County litigation in late 1985. As part of the settlement, the Bank, a state-owned bank, issued an irrevocable letter of credit to Chuidian on behalf of the Guarantee Corporation, payable ["at the counters of the"] Bank's Los Angeles branch.
 
 
 4
 Shortly thereafter, on February 26, 1986, the government of President Marcos was overthrown, and replaced by the ... government of President Corazon Aquino. The new government formed the Presidential Commission on Good Government ..., an executive agency charged with recovering "ill-gotten wealth" accumulated by Marcos and his associates....
 
 
 5
 ... In March 1986 ... [the Commission] instructed the Bank not to make payment on the letter of credit issued to Chuidian.... [T]he Commission suspected that Marcos and Chuidian had entered into a fraudulent settlement of the Santa Clara County litigation to pay off Chuidian for not revealing certain facts about Marcos's involvement in Chuidian's business enterprises. As a result, the Commission wished to examine the propriety of the settlement, and, in order to secure payment in the event of a decision against Chuidian, needed to prevent payment under the letter of credit.
 
 
 6
 When the Bank, pursuant to [the Commission's] order, refused to make payment under the letter of credit, Chuidian sued the Bank in Los Angeles County Superior Court. The Bank removed the action to federal district court pursuant to 28 U.S.C. § 1441(d).
 
 
 7
 Id. at 1097. After a fifteen day bench trial, the district court refused to enforce the terms of the letter of credit. The court determined that the letter of credit was to be performed in the Philippines, and that Philippine law, specifically the Commission's order sequestering the letter of credit, prohibited the Bank's performance. Thus, the court concluded, the Bank had successfully raised the defense of illegality of performance and its obligations under the letter of credit were excused. The court also found that the doctrine of international comity and the act of state doctrine required the court to recognize the validity of the Commission's sequestration order. The court's judgment and order is published at Chuidian v. Philippine National Bank, 734 F.Supp. 415 (C.D.Cal.1990) (Chuidian II ). Chuidian filed this timely appeal.
 
 II
 
 8
 Damir contends the district court erred in concluding that performance under the letter of credit was excused because of supervening illegality. He recognizes, as he must, that, if Manila is the place of performance of the letter of credit, performance is excused. He argues, however, that the place of performance is Los Angeles and that the Commission's order is therefore insufficient to excuse performance.
 
 
 9
 In considering this issue, we need not decide the appropriate standard of review. Even if we were to apply a de novo review standard we would conclude, with the district court, see 734 F.Supp. at 419, that Manila was the sole place of performance of the letter of credit.
 
 
 10
 The Los Angeles branch was nominated to service the letter of credit merely in an advisory role. According to Article 10(c) of the Uniform Customs and Practice for Documentary Credits (1983 Revision), "[u]nless the nominated bank is the issuing bank or the confirming bank, its nomination by the issuing bank does not constitute any undertaking by the nominated bank to pay, to accept, or to negotiate." See also U.C.C. § 5-107(1). A confirming bank, by contrast, makes a "definite undertaking" when it adds its confirmation. See Uniform Customs, Article 10(b); U.C.C. § 5-107(2).
 
 
 11
 In deciding that Manila was the place of performance of the letter of credit, the district court relied on Sabolyk v. Morgan Guaranty Trust Co. of New York, No. 84 Civ. 3179, 1984 WL 1275 (S.D.N.Y.1984) (unpublished decision), and RSB Manufacturing Corp. v. Bank of Baroda, 15 B.R. 650 (S.D.N.Y.1981). Those cases look to the place of issuance of a letter of credit to determine the place of its performance. See Sabolyk, 1984 WL 1275, at * 2-3; RSB, 15 B.R. at 654. Designation of a place of payment under a letter of credit does not alter or amplify that result unless the paying bank also serves as a confirming bank or otherwise acts in a manner indicating that its role with respect to the letter of credit is more than merely mechanical. See RSB, 15 B.R. at 654. We agree. The Los Angeles branch did not function under the letter of credit as a confirming bank. The place of performance was Manila.
 
 
 12
 The rule Damir advocates--essentially that the place of performance of a letter of credit is the place designated for "payment at the counters"--is significantly more inflexible than the analysis we approve, which focuses primarily on the relationship between the issuing and paying banks. The commentary to § 5-102(3) of the U.C.C. states that "in the present state of the law and variety of practices as to letters of credit, no statute can effectively or wisely codify all the possible law of letters of credit without stultifying further development of this useful financing device." This statement suggests a policy favoring flexibility in the articulation of rules governing letters of credit. The uniform rule favored by Damir ignores the variety of relations that can arise between issuing and paying banks. As such, it threatens to stifle the diversity of roles that letters of credit may be called upon to serve. Our rule, by contrast, permits banks by their conduct to designate places of performance in addition to the situs of the issuing bank, although, of course, parties to a letter of credit are also free to allocate the risk as to supervening illegality by explicitly designating the place or places of performance in the instrument.
 
 
 13
 The fact that the Los Angeles branch is a subsidiary of the Manila bank does not alter our conclusion. In RSB, the court held that where the Bombay branch of the Bank of Baroda issued an irrevocable letter of credit, the bank's use of its New York branch did not extend its undertaking because the New York branch served under the letter of credit in a limited, neutral capacity as adviser and payor. See 15 B.R. at 654.
 
 As the district court pointed out:
 
 14
 The letter of credit was issued by PNB/Manila; the negotiations concerning the terms and conditions of the L/C took place at PNB/Manila's offices; the application for the issuance of the L/C was submitted to PNB/Manila; ... the L/C was approved by the board of directors of PNB in Manila; Amelia Gella, officer-in-charge of PNB/LA, contacted PNB/Manila for authority to remit the two payments made to Chuidian [before the Commission's order was issued]; ... no one at PNB/LA had authority to remit any payments under the L/C without first obtaining approval from PNB/Manila; ... PNB'/LA's role in the transaction as the designated "paying bank" was nothing more than a "mechanical paymaster" possessed of the least possible amount of authority and discretion; the "sight drafts" specifically provided that PNB/Manila was the "drawee;" the "advice of negotiation" forms completed by PNB/LA after each payment state that each payment was "drawn on Philippine National Bank, Escolta, Manila;" and the L/C was entered as a liability on the books of PNB/Manila but was not entered or carried on as a liability on the books of PNB/LA.
 
 
 15
 Chuidian II, 734 F.Supp. at 419. These findings, which are not clearly erroneous, support our conclusion that Manila was the sole place of performance of the letter of credit.
 
 
 16
 Damir relies upon Republic of Argentina v. Weltover, Inc., --- U.S. ----, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), to support his position. Weltover is distinguishable. The Weltover Court decided only that Argentina's issuance of bonds was a commercial activity with a direct effect in the United States for purposes of asserting jurisdiction under the Foreign Sovereign Immunities Act. Id. at ----, 112 S.Ct. at 2162. The Court had no occasion in Weltover to articulate a rule to identify the place of performance of letters of credit.
 
 III
 
 17
 A conflict of laws analysis supports the application of Philippine law. The Philippines is the jurisdiction with the most significant relationship to the issue and the parties in this case.
 
 
 18
 Generally, "[i]n a diversity case, a federal court must apply the choice of law rules of the state in which the action was filed." Sims Snowboards, Inc. v. Kelly, 863 F.2d 643, 645 (9th Cir.1988). Here, however, jurisdiction is not based upon diversity of citizenship--all parties are citizens or instrumentalities of the Republic of the Philippines--but upon the Bank's status as a "foreign state" within the meaning of Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq. See 28 U.S.C. § 1603(a) (definition of a "foreign state"); Chuidian I, 912 F.2d at 1098. A "foreign state" sued in a civil action in state court may remove the action to the federal district court in the district where the state action is pending. 28 U.S.C. § 1441(d). In this context, federal common law choice of law rules apply, not the choice of law rules of the forum state. Schoenberg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 782 (9th Cir.1991). Federal common law follows the approach of the Restatement (Second) of Conflict of Laws (1969). Id.
 
 
 19
 Section 202 of the Second Restatement sets out the rule when a court is faced with a choice of law regarding an illegality defense. It states:
 
 
 20
 (1) The effect of illegality upon a contract is determined by the law selected by application of the rules of §§ 187-188.
 
 
 21
 (2) When performance is illegal in the place of performance, the contract will usually be denied enforcement.
 
 
 22
 Comment c to § 202 states that "the legality or illegality of performance under a contract is usually determined by the local law of the state where this performance has taken, or is to take, place.... If the answer to this inquiry is in the negative [i.e., performance is not illegal], that is the end of the matter." Since the letter of credit was to be performed in Manila and the Commission's order made performance illegal in Manila, we continue our conflicts analysis.
 
 
 23
 We are directed by § 202 of the Second Restatement to §§ 187 and 188. Section 187 sets out the rule when the parties to a contract have designated the law to govern their relationship. It does not control our analysis because the record does not indicate that the parties made such a designation.[1]
 
 Section 188 provides:
 
 24
 (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.[2](2) [T]he contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
 
 
 25
 (a) the place of contracting,
 
 
 26
 (b) the place of negotiation of the contract,
 
 
 27
 (c) the place of performance,
 
 
 28
 (d) the location of the subject matter of the contract, and
 
 
 29
 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
 
 
 30
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 
 
 31
 (3) If the place of negotiation of the contract and the place of performance are in the same state, the local law of this state will usually be applied....
 
 
 32
 Three of the factors set out in § 188(2)--the place of contracting, the place of negotiation and the domicile of the parties--readily support application of Philippine law. The letter of credit was issued in Manila. The letter of credit was issued pursuant to an Application and Agreement for Commercial Letter of Credit dated November 25, 1985, at Escolta, Manila. Moreover, although Chuidian resides in the United States, he is a Philippine citizen. Damir, as trustee in bankruptcy for Chuidian, merely stands in Chuidian's shoes. The Philippine National Bank is an instrumentality of the Philippine government. The intervenor, Philippine Export and Foreign Loan Guarantee Corporation, also is an instrumentality of the Philippine government.
 
 
 33
 The fourth factor set out in § 188--the situs of the subject matter of the contract--has no application in this case. See Second Restatement § 188, cmt. e ("When a contract deals with a specific physical thing ... or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant.").
 
 
 34
 We have already determined that Manila was the sole place of performance of the letter of credit. All of the operative factors of § 188 therefore support the conclusion that the Philippines is the jurisdiction with the most significant relationship to the illegality defense.
 
 IV
 
 35
 Performance of the letter of credit is illegal in the place it was to be performed. We need not reach the comity and act of state issues on which the district court relied in the alternative.
 
 
 36
 AFFIRMED.
 
 FERNANDEZ, Circuit Judge, dissenting:
 
 37
 We must decide whether a bank's obligation under a letter of credit will be enforced when the performance is legal at the place designated for payment but illegal at the place where the credit was issued. Here, the letter of credit explicitly stated that Chuidian was to present his sight drafts "for payment at the counters of the Philippine National Bank, Los Angeles, 700 South Flower Street Suite 2516 Los Angeles, CA 90017." No other place of payment was designated. Moreover, Los Angeles is the place where prior payments had been made.
 
 
 38
 The majority presents one possible solution. The two cases which form the basis of the majority's analysis, Sabolyk v. Morgan Guaranty Trust Co., No. 84 Civ. 3179, 1984 WL 1275 (S.D.N.Y. Nov. 27, 1984), and RSB Mfg. Corp. v. Bank of Baroda, 15 B.R. 650 (S.D.N.Y.1981), hinge their own analysis on one factor, the role of the intermediary bank. If that bank is not a confirming bank, then, as a practical matter, the place of performance under the letter of credit remains the place where the letter of credit was issued.
 
 
 39
 In my opinion the correct rule is that proposed by Damir--the place of performance of a letter of credit is the place (or places) where it is to be paid. In J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd., 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168, cert. denied, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975), the plaintiff, J. Zeevi and Sons, an Israeli partnership, was the beneficiary of an irrevocable letter of credit issued by Grindlays Bank in Uganda. Apparently, Grindlays Bank had an account at Citibank which it authorized Citibank to debit if J. Zeevi's sight drafts complied with the terms of the letter of credit. However, the drafts had to be sent to Grindlays Bank in Uganda by the negotiating bank. J. Zeevi presented its drafts to Chemical Bank in New York, which honored them and thereupon became the negotiating bank. Chemical then sought reimbursement from Citibank. Id. 371 N.Y.S.2d at 895-96, 333 N.E.2d at 170-71.
 
 
 40
 Citibank refused to honor Chemical's sight drafts. The Ugandan government had ordered that "all foreign exchange allocations in favor of Israeli companies and nationals ... be canceled" and that no payments be made under J. Zeevi's letter of credit. Id. 371 N.Y.S.2d at 896, 333 N.E.2d at 171. Grindlays Bank cancelled the letter of credit, and J. Zeevi sued in New York state court. Id.
 
 
 41
 Grindlays Bank argued that Ugandan law applied and under that law its performance was excused. The J. Zeevi court was not persuaded. It found that the law of New York, not the law of Uganda, applied because New York had "an overriding and paramount interest" in the litigation:
 
 
 42
 A vast amount of international letter of credit business is customarily handled by certain New York banks whose facilities and foreign connections are particularly adaptable to this field of operation. The parties, by listing United States dollars as the form of payment, impliedly accepted these facts and set up procedures to implement their trust in our policies. In order to maintain its pre-eminent financial position, it is important that the justified expectations of the parties to the contract be protected. Since New York has the greatest interest and is most intimately concerned with the outcome of this litigation, its laws should be accorded paramount control over the legal issues presented.
 
 
 43
 Id. 371 N.Y.S.2d at 898-99, 333 N.E.2d at 172-73 (citations omitted). In other words, the mere fact that payment was to be made in New York gave New York the greatest interest in the litigation, and thus the law of New York, not Uganda, applied. See also 9 P.S. Pilecki, L.G. Weeramantry, R. Natter, Banking Law § 239.07 at 239-35 (1992) (when dispute between beneficiary and bank concerns the bank's performance of its obligations under the letter of credit, the law of the place of performance should apply because that place has the greatest interest and "closest connection" to the transaction). Other courts have reached a similar conclusion. See Consolidated Aluminum Corp. v. Bank of Virginia, 704 F.2d 136, 137 n. 3 (4th Cir.1983), where the court when presented with a letter of credit with a provision strikingly similar to the payment provision in this case determined that since "[t]he letter of credit ... required that the draft and documents be presented [for payment] 'at the counters' of the Bank of Virginia in Richmond, Virginia ... [t]he place of performance is Virginia, and therefore the law of Virginia governs resolution of the issue here presented." In fairness it should be noted, however, that the Bank of Virginia was also the issuing bank. See also Banco de Vizcaya v. First Nat'l Bank of Chicago, 514 F.Supp. 1280 (N.D.Ill.1981) (applying law of the place of payment to determine that performance under letter of credit was not illegal despite injunction by a court at the place of issuance), vacated by unpublished order (July 23, 1981).
 
 
 44
 Moreover, the place of payment is usually considered the place of performance in analogous situations. See Republic of Argentina v. Weltover, Inc., --- U.S. ----, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). In Weltover the Court concluded that the place of performance was the place of payment for bonds issued by the Argentine government, held by international purchasers, and payable in New York if the holder so desired:
 
 
 45
 Respondents had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments. Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the United States....
 
 
 46
 Id. --- U.S. at ----, 112 S.Ct. at 2168 (emphasis added); see also Cal.Com.Code § 4102(2) (law of the place where check or other negotiable instrument is presented, paid or collected governs bank's liability). PNB's obligations under the letter of credit closely resemble Argentina's under its bonds. In both instances, liability for payment remained with the entity in the foreign jurisdiction and no domestic payor assumed any contractual obligations. Moreover, in both cases the "beneficiaries" of the obligations were foreign nationals, although here, Chuidian was a resident of the State of California. Finally, in Republic of Argentina the parties had even fewer contacts with the forum. Both the issuer of the bonds and the purchasers were foreign entities. Unlike this case, the only contact with the local forum was that the bonds were payable there.
 
 
 47
 The majority indicates that the Restatement (Second) of Conflicts of Laws (1969) supports the conclusion that Manila was the place of performance. But the Restatement sheds no light on that issue. We have been asked to determine the place of performance of a letter of credit issued in one jurisdiction but payable in another. The Restatement's choice of law analysis merely addresses what effect one should give to an illegality once it has been determined that performance is illegal at the place of performance. See Restatement (Second) Conflicts of Law § 202 comment c. It does not help with the determination of whether Manila or California was the place of performance.
 
 
 48
 The majority indicates that a rule which designates the place of performance as the place of issuance when no intermediary bank has undertaken to confirm the letter of credit is more flexible than a rule which designates the place of payment as the place of performance. I do not agree. The rules are equally uniform. Under the rule adopted by the majority, the district court need make only one finding: it must determine whether the intermediary is or is not a confirming bank. If it is not, the place of issuance controls. This is not to say that the alternative rule designating the place of payment as the place of performance is more flexible. The fact-finder's task is just as simple: it must locate the place (or places) where payment is to be made. The obligation to pay at that place will then devolve upon the issuing bank. If there is also a confirming bank, it will have the same obligation.
 
 
 49
 So if we are left with these two rather inflexible rules, we must choose between them on some principled basis. In my opinion, the majority chose the wrong one and, thus, failed to reach the right answer.
 
 
 50
 The great value of letters of credit as commercial devices is their reliability. Bank of Cochin Ltd. v. Manufacturers Hanover Trust, 612 F.Supp. 1533, 1537 (S.D.N.Y.1985), aff'd, 808 F.2d 209 (2d Cir.1986). The parties to a letter of credit effectively substitute the creditworthiness of an issuing or confirming bank for that of the account party. J.F. Dolan, The Law of Letters of Credit p 3.07 (2d ed. 1991). By doing so, they shift the risk of nonperformance from the beneficiary, usually a seller of goods, to an issuing or confirming bank. The bank is paid a premium by the account party to bear this risk, and it has no recourse against a beneficiary if the drafts presented by the beneficiary conform to the terms of the letter of credit. Goods are shipped and other actions are taken on the strength of the bank's promise that the money will be paid over.
 
 
 51
 Under the place of issuance rule, the issuing bank has the most protection against the vagaries of the legal climate and the risk of illegality is borne by the beneficiary. Under the place of payment rule, the beneficiary has the most protection. I say this because it seems to me that when a beneficiary negotiates to have payment made at a certain place, he expects to be able to obtain it there unless that violates the law of the place of payment. The beneficiary need not consider whether the entity handing over the money is an issuing, confirming, advising, paying, or negotiating bank. The beneficiary should only have to be sure that the terms of the letter of credit have been met--that being done, payment should follow, and the beneficiary should not have to worry about political or other events in far off places. The goods have been shipped or other obligations performed and payment should be made at the designated place. If it is not, the issuing bank should be liable. It, not the beneficiary, should bear the risk. The place of payment rule accomplishes just that. Thus, it more closely reflects the customary allocation of risk in letter of credit transactions and fosters the stability of those transactions.
 
 
 52
 This case is a good illustration. The parties bargained for an irrevocable obligation secured by PNB's credit and payable in United States dollars in California. In reliance on that Chuidian gave up valuable assets. However, because of the legal and political climate in the Philippines, PNB refused to pay in accordance with the terms of its letter of credit. But guaranteed payment is exactly what Chuidian bargained for, nothing in the law of California precluded that payment, and the funds were actually available in California. The letter of credit should have been performed according to its terms. PNB's failure to pay stripped Chuidian of the benefit of his bargain, even though the account party did receive what it bargained for. The majority countenances this result in the name of protecting the usefulness of letters of credit. Unfortunately, the opposite has occurred, as reflection upon what has happened to Chuidian demonstrates.
 
 
 53
 An irrevocable letter of credit is by its nature meant to be irrevocable in all but a few limited circumstances (usually where there is fraud in the procurement or payment of the letter of credit). Recognizing the place of payment as the place of performance in this case would effectuate the parties' agreement and thus enhance the "reliability and fluidity" of letters of credit. Bank of Cochin Ltd., 612 F.Supp. at 1537.
 
 
 54
 Because the purpose of letters of credit is to facilitate commerce and to induce the beneficiaries to part with goods or expend services on the basis of those letters, the place of payment approach is the correct rule. Under the place of payment rule, California was the place of performance, and Damir is entitled to payment.[1] I fear that the majority's selection of the opposite rule will undermine the certainty and reliability of commercial transactions which depend upon letters of credit. Thus, I dissent.
 
 
 
 [1]
 The district court found that the letter of credit designated Philippines law. See 734 F.Supp. at 419. This finding, however, is clearly erroneous. The record indicates that the letter of credit makes no such designation. It does refer to the Uniform Customs and Practice for Documentary Credits, 1983 Revision, but the Uniform Customs do not have the force of law. In addition, the Uniform Customs does not contain a choice of law provision
 
 
 [2]
 Section 6 states the general principles a court should follow in determining choice of law questions. It calls on the court to consider (1) the needs of international systems, (2) the relevant policies of the forum, (3) the relevant policies of other jurisdictions and their relative interests in determination of the issue, (4) protection of justified expectations, (5) basic policies underlying the field of law in issue, (6) predictability of result and (7) ease in determination of the law to be applied
 
 
 [1]
 Given the majority's opinion, I need say little about the international comity and act of state doctrines also relied upon by the district court. Suffice it to say, however, that I would "reject the notion that a federal court owes greater deference to foreign courts than to our own state courts." Neuchatel Swiss General Ins. Co. v. Lufthansa Airlines, 925 F.2d 1193, 1195 (9th Cir.1991). Since California is the place of payment and the PCGG orders are based upon an allegation of fraud twice disproven in courts within the United States, I would decline to protect PNB by relying on comity or the act of state doctrine