Patrick J. MURPHY, et al.,
Plaintiffs–Appellees,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, et al.,
Defendants–Appellants.

Patrick J. MURPHY, an individual; Murphy's Markets, Inc., a California Corporation; Ramsey Marketing and Management Co. ("RAMCO"), aka: Ramsay Marketing and Management Co., a California Corporation, Plaintiffs–Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, et al.,
Defendants–Appellees.

FEDERAL DEPOSIT INSURANCE CORPORATION; First National Bank, Plaintiffs–Appellees,

v.

Patrick J. MURPHY, Defendant–Appellant.

Nos. 91–15511, 91–15640 and 91–15642.

United States Court of Appeals,
Ninth Circuit.

Argued June 23, 1994.

Decided Oct. 26, 1994.

E. Whitney Drake, Sp. Counsel, F.D.I.C., Washington, DC, Patrick J. Hogan and John D. O'Connor, Tarkington, O'Connor & O'Neill, San Francisco, CA, for FDIC.

John F. Wells, Stark, Wells, Rahl, Schwartz & Schieffer, Oakland, CA, William C. Rust, Jr., San Francisco, CA, for Murphy.

Before: BROWNING, HUG, POOLE, D.W. NELSON, NORRIS, REINHARDT, BEEZER, HALL, WIGGINS, THOMPSON and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

The beneficiary of a letter of credit sought to recover against the FDIC, after the issuing bank failed. The FDIC argues that recovery is barred by the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e). We reject these arguments. The traditional commercial law principle, that a letter of credit stands independent of irregularities in its procurement, survives bank failure. Our earlier decision, at 12 F.3d 1485 (9th Cir. 1993), is vacated.

## I. Facts.

Mr. Murphy won his suit against the FDIC in a jury trial. The FDIC does not challenge any of the jury instructions. Its appeal arises out of denial of its motions for directed verdict and judgment notwithstanding the verdict. Many of the facts were established by stipulation. For those which were not, Murphy is entitled to have the evidence viewed in a light most favorable to him, resolving conflicts in his favor and giving him the benefit of reasonable inferences, to determine whether substantial evidence supported the verdict. *Vaughan v. Ricketts,* 950 F.2d 1464, 1468 (9th Cir.1991). We are required to sustain a judgment based on a jury verdict if it was supported by substantial evidence, that is, such relevant evidence as "reasonable minds might accept as adequate to support a conclusion." *Davis v. Mason County,* 927 F.2d 1473, 1486 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). For that reason, the facts as recounted below are based largely on Murphy's testimony, the exhibits, and the stipulated facts. The central issue at trial was whether Murphy was a perpetrator or a victim of the mismanagement of a bank. The jury decided he was a victim.

In 1982, Frederick L. Hilger, Sr. organized a holding company, Pacific National Bancshares, in order to buy a bank, First National Bank, Chico. Eleven investors put up $83,-000 each, and each obtained a one-eleventh share of the holding company. Murphy, a grocer, was one of the investors. The holding company borrowed $2.25 million from Security Pacific National Bank to pay for the bank it was buying. Each of the eleven investors had to guarantee the $2.25 million note. Murphy became one of the directors of both entities, the holding company and the Bank. Hilger was chairman of the board and chief executive officer of both entities.

In June of 1984, Murphy decided to withdraw from the Bank. At a board of directors meeting in June, he announced his resignation, said good-bye to his fellow board members, and left. Within a day or two Hilger came to him on behalf of the remaining shareholders and offered to have the holding company buy his shares for $400,000. When other board members had resigned shortly before, the remaining investors had agreed to pay up to $400,000 for each of their shares, and had succeeded in acquiring them for $200,000. Murphy agreed on the $400,000 price, and agreed to take a promissory note for $395,000 of it. He wanted the note to be secure, and to be something which his grocery and equipment supplier, United Grocers, would accept as collateral when he needed credit. Hilger suggested the Bank give him a letter of credit. After Murphy called United Grocers and ascertained that it would accept the note secured by the letter of credit as collateral for Murphy's own obligations, Murphy agreed. Murphy remained liable to Security Pacific on his personal guarantee of the holding company's $2.25 million note, subject to his cross-indemnification agreements for one eleventh each with the other ten investors.

The FDIC presented as evidence minutes of board of directors meetings which said that Murphy resigned in July. The date matters because, according to Murphy's evidence, he was no longer a director when he sold his stock and accepted the note secured by the letter of credit. According to the FDIC's evidence, he was still on the board. Murphy testified that the minutes which suggested that he did not resign until July were false. To the extent that it supports the verdict, Murphy is entitled to have his appeal proceed on the basis that his account was the truth.

To secure its $395,000 note, the holding company gave Murphy a standby letter of credit from the Bank addressed to Murphy's supplier, United Grocers. The letter of cred-

it promised United Grocers that the Bank would pay the holding company's note if the holding company defaulted:

> This will act as your letter of credit wherein should there be a default in the payment of the note according to its terms to Murphy or his assignee, then First National Bank will buy from you or the then holder of the note, the note at its then unpaid balance. Our only requirement relative to this letter of credit is that any failure of payment according to the terms be brought to the notice and attention of First National Bank within thirty (30) days after the same shall have occurred.

Murphy's supplier could, with the note and this standby letter of credit, rely on the Bank's financial soundness, not just the holding company's and Murphy's, when it extended credit to Murphy. Its $395,000 would be as safe as the Bank's credit.

The contingent form of the "standby" letter of credit distinguished it from a traditional letter of credit. In its traditional form, a letter of credit to a supplier might be a bank's promise to pay the supplier upon presentation of the seller's draft and shipping documents such as a bill of lading. *See* Robert Braucher & Robert A. Riegert, Introduction to Commercial Transactions 358–76 (1977). Formal requirements for letters of credit are so flexible that they have evolved to embrace, in some "standby" applications, something resembling a guarantee. *See id.* at 375; U.C.C. §§ 5–103, 5–104.

> The principal difference between the traditional letter of credit and these newer standby letters is that "whereas in the classical setting, the letter of credit contemplates payment upon performance, 'the standby credit,' . . . 'contemplates payment upon failure to perform.'"

*First Empire Bank–New York v. FDIC,* 572 F.2d 1361, 1367 (9th Cir.) (quoting Katskee, *The Standby Letter of Credit Debate—the Case for Congressional Resolution,* 92 Banking L.J. 697, 699 (1975)), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). Standby letters of credit are expressly provided for by federal banking regulations. *See* 12 C.F.R. §§ 208.8(d), 215.3(a)(3), 337.2. The FDIC has not contested the categorization of the instrument in the case at bar as a letter of credit.

In November of 1983, Murphy borrowed $100,000 from the Bank to invest in some municipal bonds. His note came due in November of 1984, but the Bank extended it. Murphy testified that Hilger, on behalf of the Bank, assured him orally that he would not have to pay the note until he had been paid the $395,000. But the jury returned a verdict that there was no "agreement between Patrick Murphy and First National Bank that he would not be required to pay his note to the bank until the obligations of Pacific National Bank were paid to him." On Murphy's cross-appeal, the FDIC is entitled to have this part of the verdict treated with as much deference as Murphy's verdict.

In October, 1985, about sixteen months after Murphy sold out, the holding company was in desperate need of money to pay Security Pacific on its note. Hilger and William G. Edmondson, another board member, asked Murphy to loan $190,000 to the holding company, which would be repaid in January. They told him they would back the loan with "a letter of credit, like the other one, guaranteed by some fifty-five million plus in deposits." After checking with United Grocers to make sure it had received the new letter of credit, Murphy gave Edmondson the $190,-000.

In the course of the discussions, Murphy asked Edmondson "how is it going at the Bank?" and Edmondson replied that "we've got growing pains." The Office of the Comptroller of the Currency had, in June 1985, issued an order to the Bank to cease and desist transactions such as this one. The Bank should not have issued the letter of credit. Edmondson and Hilger could not properly use the Bank's credit for the holding company's note as they did. But Murphy did not know any of this. The government ordinarily keeps such orders secret. Edmondson and Hilger did not tell him that the "growing pains" included a cease and desist order. The jury decided that as to this letter of credit, Murphy was defrauded.

In January, when the holding company did not pay him, Murphy mentioned it to his

attorney during a consultation on another matter. The attorney said "let's go get your money," they walked the five blocks to Edmondson's office, and demanded payment. Edmondson said there was nothing to worry about, and payment was on its way. After some unsuccessful correspondence to try to collect, Murphy arranged for United Grocers to make formal demand from the Bank on the letters of credit, which it did in March of 1986. Then United Grocers assigned the notes and letters of credit back to Murphy.

There was evidence from which the jury could infer that these letters of credit were in the Bank's files, though not reflected in its books of account and ledgers. Murphy testified that Hilger's son, the Bank's cashier and then president in 1984 and 1985, called Murphy and asked him for a copy of the 1984 letter of credit because the Bank had misplaced it. Hilger later told Murphy not to bother, because he knew where it was kept. Kenneth Willbanks, a vice president of the Bank testified that he had put the 1985 letter of credit in the Bank's Murphy loan file. The letters are referred to in a footnote to the financial statements of the year ended December 31, 1985, which says that "[m]anagement intends not to honor the letters of credit based on the questioned authenticity of such letters of credit." This footnote shows that the letters of credit were not secret from the Bank when the statements were prepared. Hilger testified that they were approved and ratified by the Bank's board of directors. Murphy's evidence entitled the jury to conclude that the Bank did not reflect the letters of credit as liabilities before demand was made, because they were contingent, and after the contingency became certain, because it took the position that they were not properly authorized.

Eight months after its refusal to pay on the letters of credit, the Bank failed. On November 20, 1986, the Comptroller of the Currency closed the Bank and appointed the FDIC as receiver. The United States successfully prosecuted Hilger criminally for defrauding Murphy in connection with the $190,000 loan in 1985, and for concealing the 1984 letter of credit from bank regulators. Hilger was convicted of both sets of charges

and went to prison. The FDIC refused to pay the letters of credit when it paid the Bank's other obligations. Murphy then sued the FDIC. He joined First Interstate Central Bank, which had assumed the failed Bank's liabilities. The FDIC sued Murphy, in the case consolidated with this one, for payment of his $100,000 note to the failed bank. Murphy won his lawsuit against the FDIC but lost against First Interstate, and the FDIC won its suit against Murphy. Each party appeals to the extent that it lost.

The jury specifically found that Murphy had been misled but not defrauded with respect to the 1984 letter of credit. It found that he had been defrauded as well as misled with respect to the 1985 letter of credit. The jury found that the FDIC was liable to Murphy on both letters of credit, on contract and negligent misrepresentation theories, and on the 1985 letter of credit on his fraud theory as well.

The district court decided that the $100,000 note was not subject to setoff by the Bank's obligation to Murphy, so he was required to pay interest and attorneys' fees for collection despite the existence of the larger obligation of the Bank to him. The District Court rejected Murphy's claim against First Interstate Central Bank as a matter of law, because it specifically did not assume standby letters of credit when it assumed all the Bank's deposits and took over its assets at the FDIC's request.

## II. Analysis.

The primary issue in the case is whether the FDIC could properly dishonor letters of credit because of irregularities in their issuance, if Murphy was not responsible for the irregularities. Secondary issues relate to setoff and assumption by the successor bank.

### A. *D'Oench, Duhme.*

■ The FDIC argues that as a matter of law, Murphy could not recover on the letters of credit because he was barred by the *D'Oench, Duhme* doctrine. In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), a bond dealer had given a bank a promissory note for $5,000 on demand to cover some slow paying bonds.

The Bank had promised him not to call the note, just to take what the bonds eventually paid. The note was given to the bank to conceal irregularities from the bank examiners. Neither the language of the note nor anything else in the Bank's records disclosed the agreement not to call the note. So far as anyone could tell from examining the Bank's files, it had a $5,000 asset. The Supreme Court held that the bond dealer was estopped to deny his obligation on the note, because he "lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the Bank was or was likely to be misled." *Id.* at 460, 62 S.Ct. at 681.

In this case, the *D'Oench, Duhme* issue was tried to the jury. The central issue in the trial was whether Murphy "lent himself to a scheme" or was its victim. The jury in this case decided that he was a victim, not a participant in the scheme. Under the jury instructions, Murphy could not have won his verdict, unless the jury decided that the predicate for *D'Oench, Duhme* was absent. The jury decided that Murphy did *not* knowingly lend himself to a scheme likely to deceive the banking authorities. Here is the instruction the court gave the jury:

> Letters of credit are not validly issued by a bank if:
>
> 1. Not approved by the Board of Directors with the approval reflected in minutes of Board of Directors.
>
> 2. Not regularly entered in the bank's books and records.
>
> 3. Not fully (at least 100%) collateralized, or if intended to extend unsecured credit to the holding company.
>
> 4. The amount exceeds the lending limit of the bank.
>
> 5. The amount exceeds the authorized lending limit of the loan officer approving and issuing the letters of credit.
>
> 6. If issued in violation of an order from the regulating authority.
>
> *If a person knowingly lends himself to an arrangement which is likely to mislead the regulatory authorities,* and if the person is aware of one or more of the infirmities I have just listed, it is of no conse-

quence that the person did not know the fraudulent or illegal nature of the arrangement, or that he had no specific intention to deceive the banking authorities.

(Emphasis added). We have no occasion to decide whether this instruction was correct, because neither side has challenged it in this appeal. The relevance of the text of the instruction is that we can infer from it, and Murphy's verdict, what the jury decided were the true facts. One possible view was that a crooked banker, Hilger, inveigled a prosperous and innocent grocer into parting with stock for credit instead of cash, and loaning additional cash, on the strength of the Bank's letters of credit, and then the FDIC evaded its obligations as receiver. Another possible view was that a clever grocer, seeing that his bank was failing, unloaded his stock for an inflated price, to be paid by the bank instead of the buyers, leaving the FDIC with a looted shell. Either view, and possibly others, might have been possible before the verdict. The jury verdict adopted something like the former, and decisively rejected the latter.

In its brief, the FDIC argues that Murphy lent himself to a scheme, and that the second transaction defied federal regulatory orders. We cannot make any sense of this argument in light of the verdict. The brief makes no attempt to show that evidence was lacking for the verdict, and any such attempt would be futile, because of Murphy's testimony and the stipulated facts. The FDIC's attack on Murphy, suggesting that he conspired to misuse the Bank's credit, must be disregarded, because the jury found on adequate evidence to the contrary.

Because the jury established that in fact Murphy did not lend himself to the scheme, that is the end of the *D'Oench, Duhme* issue. For *D'Oench, Duhme* to apply, "there at least must be a showing that 'the maker lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled.'" *FDIC v. Meo,* 505 F.2d 790, 792 (9th Cir.1974) (quoting *D'Oench, Duhme,* 315 U.S. at 460, 62 S.Ct. at 681). Whatever secret agreements may or may not have existed, and whatever Hilger and his associates may have caused to be put on the Bank's

books, Murphy's innocence of any such scheme precludes application of the *D'Oench, Duhme* equitable estoppel.

The FDIC has suggested that the letters of credit were secret agreements, not reflected in the Bank's records. The jury may have decided to the contrary, that they were in the Bank's files, though not reflected in its books. Regardless, because the verdict establishes that Murphy did not lend himself to whatever scheme might keep them hidden from bank regulators, *D'Oench, Duhme* could not bar recovery.

■ This case is the opposite of the usual *D'Oench, Duhme* case because Murphy was a creditor, not a debtor. In the usual *D'Oench, Duhme* case, the customer has signed a note which he says the bank promised orally not to call. The note is worth less than what it looks like because of an oral agreement not reflected in the bank's records. That is participation in a scheme, for *D'Oench, Duhme* purposes, even if the customer acts in good faith, because the customer knowingly creates the potential for the bank examiners to overvalue the bank's assets, by signing the note. In the unusual case where the *bank* signs the written instrument, and the person claiming on it has not made any oral agreement contrary to the instrument, the customer does not necessarily have any responsibility for potential overvaluation of the bank's assets. For the debtor who signs a note subject to an oral agreement not to call it, signing the note enables the bank to overstate its assets, so by signing he "lent himself to a scheme." But for the creditor, who makes no oral agreement, something other than his signature must be proved to make him a participant in a scheme, assuming that *D'Oench, Duhme* applies to creditors at all. *D'Oench, Duhme* is an estoppel case. The bank's own failure to reflect a liability in its books, contingent or not, cannot estop a creditor who has no responsibility for that failure.

Subsequent cases have not vitiated the well established doctrine of *Meo* and *D'Oench, Duhme* itself, that for *D'Oench, Duhme* estoppel to operate, "there at least must be a showing that 'the maker lent himself to a scheme or arrangement whereby the banking authority . . . was or was likely to be misled.'" *Meo*, 505 F.2d at 792 (quoting *D'Oench, Duhme*, 315 U.S. at 460, 62 S.Ct. at 681). *Langley v. FDIC*, 484 U.S. 86, 93, 108 S.Ct. 396, 402 (1987), holds that fraud in the inducement by a bank does not entitle the maker of a note to use that fraud as a defense against the FDIC, under 12 U.S.C. § 1823(e). *FDIC v. Zook Bros. Constr. Co.*, 973 F.2d 1448, 1451 (9th Cir.1992), holds that good faith does not prevent *D'Oench, Duhme* from operating to estop a guarantor from denying liability on her written guarantee. *In re Century Centre Partners Ltd.*, 969 F.2d 835 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2997, 125 L.Ed.2d 690 (1993), applies *Langley* to prevent a borrower defrauded by a bank from taking advantage of the fraud as a defense against the FDIC. *In re Century Centre*, emphasizes that the borrower in that case "could have investigated," and that *D'Oench, Duhme* " 'favors the interests of depositors and creditors of a failed bank, who cannot protect themselves.'" *Id.* at 839 (quoting *FDIC v. McCullough*, 911 F.2d 593, 600 (11th Cir.1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991)).

■ Unlike the FDIC's adversaries in *Langley, Century Centre* and *Zook*, Murphy is not trying to avoid his duties under papers *he* signed and gave to the Bank. He is not trying to avoid performance of his promise on the basis of his good faith and the Bank's wrongdoing. Instead, he is trying to hold the FDIC to the written promise *the Bank* signed. The former type of case can give rise to an estoppel because the signer puts the Bank in a position to make a bank examiner think the Bank's net worth and the soundness of its banking practices are better than they really are. The latter type of case does not give rise to that risk. A pure heart alone will not prevent *D'Oench, Duhme* estoppel. *Zook Brothers*, 973 F.2d at 1451. Signing a promise to pay money to a bank, if the promise does not mean all that it says, amounts to lending one's self to a scheme, even if it is done with a pure heart. Where a person does not lend himself to a scheme which might cause bank examiners to overvalue a bank, by giving the bank a writing

which meant less than what is said or otherwise, then *D'Oench, Duhme* has no application.

 Murphy argues that *D'Oench, Duhme* also does not apply because he was a creditor of the Bank, not a debtor. This is a serious issue. In its common application, *D'Oench, Duhme* prevents a debtor from using an oral agreement not to call his note, against the FDIC. The estoppel operates against one who "gives such a note to a bank with a secret agreement that it will not be enforced.... The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect." *D'Oench, Duhme,* 315 U.S. at 460, 62 S.Ct. at 680–81. The phrase "or would tend to have that effect" enables the estoppel to operate even though the maker of the note acts in good faith.

For example, a merchant may have a regular line of credit with a bank whereby the bank extends credit either on demand, or by issuing six month notes. Additionally, the merchant and the bank may have an oral agreement that the bank will not call in the debt barring unforeseen developments in the merchant's business. If the bank fails, the FDIC often calls the merchant's note without respect for the understanding he had with his banker.

 It is unusual to see the *D'Oench, Duhme* doctrine asserted against a creditor rather than a debtor, and we have not decided whether it can be. *See In re NBW Commercial Paper Litigation,* 826 F.Supp. 1448, 1454–56 (D.D.C.1992) (very helpful analysis of this issue, among others, by Judge Lamberth). We do not reach the question of whether *D'Oench, Duhme* applies to creditors as well as debtors, because its application is barred in any event by Murphy's innocence of the scheme. For that reason, we do not decide whether we would agree with the view that *D'Oench, Duhme* does apply in some circumstances to the bank's creditors, as on letters of credit. *Cf. OPS Shopping Ctr. v. FDIC,* 992 F.2d 306, 308–10 (11th Cir.1993).

**B. 12 U.S.C. § 1823(e).**

 The FDIC argues that Murphy was barred, as a matter of law, from enforcing the letters of credit, because they did not satisfy the requirements of 12 U.S.C. § 1823(e). That statute prevents enforcement against the FDIC of certain agreements not meeting requirements of writing, contemporaneity, authorization, and record.

No agreement which tends to diminish or defeat the right title or interest of the Corporation [FDIC] *in any asset* acquired by it under this section, either as security for a loan or by purchase shall be valid against the Corporation unless such agreement

(1) shall be in writing,

(2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank,

(3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) shall have been, continuously, from the time of its execution, an official record of the bank.

12 U.S.C. § 1823(e), as in effect at the relevant time (emphasis added). Murphy argues that the statute does not apply, but even if it does, the letters of credit met all four criteria. We do not reach the question of whether the criteria were met, because the statute has no application.

 The statute applies to an "agreement which tends to diminish or defeat the interest of the Corporation *in any asset.*" A letter of credit is not an asset of the bank. It is a liability. A standby letter of credit is a contingent liability. We withdraw from the statement to the contrary expressed in our earlier opinion. *Murphy v. FDIC,* 12 F.3d 1485, 1491 (9th Cir.1993). Our citation of *OPS Shopping Ctr.,* 992 F.2d at 309, in our earlier opinion, in support of the proposition that the Bank's letter of credit is a § 1823(e) "asset," is mistaken. *OPS* expressly says at page 309, note 3, that it is based on *D'Oench,*

*Duhme,* not on § 1823(e), and does not address the FDIC's statutory arguments. The words "asset" and "liability" are antonyms, not equivalents. The statute protects against inflated assets. It does not operate on liabilities.

■ We have no occasion to determine the applicability of the new provision in FIRREA at 12 U.S.C. § 1821(d)(9). This 1989 statute provides in pertinent part:

> [A]ny agreement which does not meet the requirements set forth in [12 U.S.C. § 1823(e)] shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation.

In this case, the letters of credit were issued in 1984 and 1985, Murphy made demand on them in 1986, the bank closed and the FDIC was appointed receiver in 1986, and Murphy filed suit on the letters of credit in 1988, all prior to passage of the statute. The FDIC has correctly conceded in this case that 12 U.S.C. § 1821(d)(9) does not apply retroactively.

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994).

C. Illegal issuance.

■ The FDIC argues that the letters of credit should not be honored because they were improperly issued. The Bank issued the second one in violation of a cease and desist order. The holding company may not have given the Bank adequate security for them. The Bank's board of directors may not have approved them in advance of their issuance. These irregularities may have violated laws and regulations, such as 12 U.S.C. §§ 371c(c)(1), 375b(2), 12 C.F.R. § 215.4, and the cease and desist order. The FDIC argues that Murphy's ignorance of these irregularities, and his not having lent himself to them, was irrelevant.

■ Although Murphy offers rebuttal as to the illegalities, we do not decide whether the Bank committed the several violations. We assume, for purposes of decision, that it did. The Bank's wrongdoing does not affect enforceability, because of the traditional principle that a letter of credit remains enforceable despite irregularities in the underlying transaction.

■ There are typically three parties to a letter of credit. The bank's customer, sometimes called the account party, obtains it from the bank. The bank issues the letter. The beneficiary parts with value in exchange for the letter of credit. *See* U.C.C. § 5–103(1)(a); Robert Braucher & Robert A. Riegert, Introduction to Commercial Transactions 358–76 (1977). For example, a merchant in Fairbanks may obtain a letter of credit from a bank in Seattle so that he can buy goods with it in Seoul. That way the seller in Seoul does not have to inquire into the Fairbanks merchant's credit, or charge a price high enough to cover the risk that payment will be stopped if the buyer is dissatisfied with the goods. He can treat the bank's promise to pay as absolute. He can value the letter of credit as though it were cash, without concerning himself with whether the merchant has breached some duty to the bank. Likewise, in the single most common letter of credit transaction, a traveler can use a traveler's check to secure food and lodging on the strength of the issuing bank's credit, without regard to whether irregularities tainted the bank's issuance of the checks to the traveler. We have no occasion to decide in this case anything regarding stolen or forged letters of credit, or letters of credit issued utterly without authority. Because

the whole point of these instruments is to enable the bank's customer to obtain something from a third party by using the letter of credit as though it were cash, it has long been the law that the "issuing bank's obligation created by the letter of credit is totally independent of the other contracts." *Sound of Market Street, Inc. v. Continental Bank International,* 819 F.2d 384, 388 (3d Cir.1987) (citations omitted); *see also Security Fin. Group, Inc. v. Northern Kentucky Bank & Trust, Inc.,* 858 F.2d 304, 306–07 (6th Cir.1988).

In this case, the customer was the holding company, Pacific National, which bought Murphy's stock, and later borrowed money from him. The bank was the failed institution, First National Bank. The beneficiary was Murphy's assignor, United Grocers. We assume for purposes of discussion the proposition, urged by the FDIC, that the second letter of credit, for $190,000, was issued by the Bank in direct violation of the cease and desist order from the Comptroller of the Currency. We also assume that the holding company obtained both letters of credit with inadequate collateral, and that the Bank violated 12 U.S.C. § 371c(c) by issuing the letters of credit without adequate security, and that both letters of credit were obtained by the holding company from the Bank by means of overreaching, in breach of its fiduciary duty. Nevertheless, once it is established, as it was by the verdict in this case, that Murphy was not responsible for those abuses, and did not lend himself to the scheme by which they were accomplished, his position cannot be affected by them. The reason is that Murphy's rights stand independent of the holding company's breaches of its duties to the Bank.

The Uniform Commercial Code and its comments adhere to the hoary principle of independence. U.C.C. § 5–114, cmt. 1. Letters of credit have very ancient origins.[1] The principle of independence has been essential to their use as a cash equivalent. Because the instrument was ancient in Blackstone's time, it would be most surprising if the law had quietly abandoned the fundamental principle which makes it useful. The authority cited by the FDIC, *Chuidian v. Philippine National Bank,* 976 F.2d 561 (9th Cir.1992), does not stand for the proposition that the independence principle should not survive a cease and desist order or bank failure. *Chuidian* held that Philippine law applied to the letter of credit issued in that case, so illegality of performance under Philippine law of a letter of credit to be performed in the Philippines excused performance. No such choice of law issues affect the case at bar, nor is it governed by foreign law. Indeed, differences between Philippine and American law on the independence principle may affect sellers' decisions about whether to honor at face value letters of credit issued by Philippine and American banks.

We hold that the principle, that the "issuing bank's obligation created by the letter of credit is totally independent of the other contracts," *Sound of Market Street,* 819 F.2d at 388, is unaffected by a Comptroller's cease and desist order, and unaffected by failure of the bank and substitution of the FDIC for the issuing bank as receiver or in its corporate capacity. This is consistent with our view in *FDIC v. Bank of San Francisco,* 817 F.2d 1395, 1399 (9th Cir.1987), and that of the Sixth Circuit in *Security Fin. Group,* 858 F.2d at 306–07. The penalties for the violations of law must be imposed on

---

1. A bill *of exchange* [the traditional English term for letter of credit] is a security, originally invented among merchants in different countries, for the more easy remittance of money from one to the other, which has since spread itself into almost all pecuniary transactions. It is an open letter of request from one man to another, desiring him to pay a sum named therein to a third person on his account; by which means a man at the most distant part of the world may have money remitted to him from any trading country.... This method is said to have been brought into general use by

the Jews and Lombards, when banished for their usury and other vices; in order the more easily to draw their effects out of France and England, into those countries in which they had chosen to reside. The invention of them was a little earlier: for the Jews were banished out of Guienne in 1287, and out of England in 1290; and in 1236 the use of paper credit was introduced into the Mogul empire in China. II Blackstone's Laws of England 466–67 (1766) (footnotes omitted). If the first two parties are banks, then the third can confidently treat the letter of credit as money.

the violators, such as the bank president (Hilger went to prison), not on innocent beneficiaries of this ancient commercial instrument. *See* 12 U.S.C. § 504. For the FDIC to stand in a stronger position than the failed bank as to a letter of credit issued by the bank, it generally needs a defense under the *D'Oench, Duhme* doctrine or § 1823. It had none.

■ The FDIC's other cavils are insubstantial. Although it claims that Murphy, as a director, should have protected the Bank from the holding company's use of the Bank as an issuer of the first letter of credit, the jury could have concluded either that he was no longer a director when the letter of credit was issued, or that he proved the good faith and fairness of the transaction including reasonableness of the price, and permissible reliance on bank officers. The evidence allowed for either possibility, and the verdict on the instructions establishes that the jury found one or both of these propositions to be true. It cannot be assumed that the price of the stock was inflated. Murphy invested $83,000 cash and a $2.25 million loan guarantee. He got out with $5,000 cash, continuing liability on the guarantee (he eventually had to pay $106,000 to Security Pacific to settle his share), and a note for $395,000. He had no knowledge that the Bank would soon fail, the remaining investors were willing to pay the same price to those who sold out immediately before him, and some remaining investors thought the stock was worth $1,000,000. Because we must give Murphy the benefit of all reasonable inferences, *Vaughan v. Ricketts*, 950 F.2d at 1468, we must assume that the stock was fairly valued. The second letter of credit, for $190,000, was totally separate from Murphy's stock sale, issued to secure a cash loan, and occurred long after he was off the board.

The FDIC argues that Murphy failed to comply with the presentment requirements as to the letters of credit, but the jury instructions required the jury to find, before it returned a verdict for Murphy, that United Grocers did indeed "strictly comply" with presentment requirements. The evidence allowed for that determination.

The FDIC also argues that as a matter of law, Murphy was not entitled to recover for the tort of fraud. Because we affirm his recovery on the letter of credit, which is a contract theory, we do not reach the tort issues of whether Murphy could recover against the FDIC for the Bank's fraud or misrepresentation.

D. Murphy's Claim against First Interstate Central Bank.

■ The FDIC and First Interstate Central Bank agreed that First Interstate would assume liabilities and purchase assets of the failed bank, First National. The assumption agreement expressly excluded "standby letters of credit as defined by Part 337.2(a) of FDIC's Rules and Regulations (12 C.F.R. 337.2(a))." Murphy does not dispute that, when issued, the letters of credit fell within this exclusion. He argues that when First Interstate assumed liability for "all demand deposits" of First National, the letters of credit had become "demand deposits" under 12 U.S.C. § 1813(*l*)(1).

We reject this proposition, and affirm the dismissal of Murphy's claim against First Interstate. The result was compelled by *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986). That case holds that the statutory term "deposit" "does not include a standby letter of credit backed by a contingent promissory note." *Id.* at 432, 106 S.Ct. at 1935. The "contingent note" in that case was a note, unconditional on its face, but subject to an understanding that the account party would pay the bank only what the bank paid the beneficiary on the letter of credit. The Supreme Court construed deposits in accord with the purpose of the statute, to protect hard dollars entrusted to banks:

> Congress' focus in providing for a system of deposit insurance—a system that has been continued to the present without modification to the basic definition of deposits that are "money or its equivalent"— was clearly a focus upon safeguarding the assets and "hard earnings" that businesses and individuals have entrusted to banks. Congress wanted to ensure that someone who put tangible assets into a bank could

always get those assets back. The purpose behind the insurance of deposits in general, and especially in the section defining deposits as "money or its equivalent," therefore, is the protection of assets and hard earnings entrusted to a bank.

This purpose is not furthered by extending deposit insurance to cover a standby letter of credit backed by a contingent promissory note, which involves no such surrender of assets or hard earnings to the custody of the bank....

*Id.* at 435, 106 S.Ct. at 1936. What the Supreme Court considered especially important was that the customer did not pay anything for the letter of credit except for a note, which could not be called unless the beneficiary made a claim against the letter of credit. *Id.* We are unable to distinguish *Philadelphia Gear* from the case at bar. Murphy parted with hard money for the second letter of credit, and stock for the first, but neither the money nor the stock went to the Bank. The holding company got the hard assets. The record does not establish that the Bank got "money or its equivalent" in exchange for issuing the standby letters of credit. Murphy's case is no better, therefore, than the beneficiary's in *Philadelphia Gear.* In the absence of money or its equivalent having been paid to the bank for the letters of credit, they did not become deposits.

E. Set-off.

■ Murphy does not contest his liability on the $100,000 note. He argues that his $100,000 debt should have been treated as a set-off against the FDIC's much larger debt to him, so that he rather than the FDIC should have prevailed in the FDIC's suit against him on the note. That would affect interest, attorneys' fees, and costs, on the FDIC's lawsuit against Murphy on his note.

The jury verdict established, by express special verdict, that Murphy had no agreement that he would not be required to pay the note until the Bank paid its obligations to him. He was entitled to no set-off on the basis of any contract.

■ The right to set-off may arise, however, independently of contract. We held in *FDIC v. Mademoiselle of California,* 379 F.2d 660 (9th Cir.1967), that set-off arises independently of contract, as a matter of equity, where a person was both a creditor of and a debtor to an insolvent bank:

Though the right of set-off did not exist at common law, equity has long recognized it. A common application of set-off occurs when a depositor is indebted to his bank, the bank is declared insolvent, and the depositor's account balance is set off against his indebtedness to the bank. Such a set-off is allowed under the National Bank Act, so that only the balance of the debt after set-off is considered an asset of the insolvent bank.

*Id.* at 663 (citations omitted). There is no lack of mutuality in the case at bar, such as complicated the issue in *Mademoiselle.* Federal common law is consistent in this respect with California law and with general principles of equity. Under California law, if "cross-demands for money have existed between persons at any point in time," they are generally treated as paid to the extent which they are equal, when one such person commences an action. Cal.Civ.Proc.Code § 431.70; *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1521 (9th Cir.1985); *Jones v. Mortimer,* 28 Cal.2d 627, 170 P.2d 893, 896 (1946). This is a doctrine of civil procedure, not dependent on whether there was a contract.

■ The FDIC argues that Murphy's set-off was barred because any agreement he had for a set-off was oral and not reflected in the Bank's records. This argument is beside the point. Murphy's set-off arises as a matter of law, not by reason of any agreement, written or oral, reflected in the Bank's records or not.

■ The reason that the set-off is not barred by 12 U.S.C. § 1823(e), is that the statute invalidates only an "agreement" which diminishes the FDIC's right in its corporate capacity to collect on a note. Set-offs arising by operation of law "are not 'agreements' within the meaning of § 1823(e)." *FDIC v. State Bank of Virden,* 893 F.2d 139, 143 (7th Cir.1990). We follow *Virden* in holding that set-offs arising by

operation of law are not automatically barred by § 1823(e), although a particular set-off, if it amounts to a claim based on breach of an agreement, may be barred. *Id.* In this case, the set-off is the "common" kind, described in *Mademoiselle.* Murphy owed the Bank $100,000 on a note, and following presentment, dishonor, and assignment by United Grocers of the letters of credit to Murphy, the Bank owed Murphy $585,000 on its letters of credit. The letters of credit were not an undisclosed agreement. They were in the Bank's files and reflected in the footnote. Murphy was entitled to a judgment that the FDIC should take nothing in its action against him on his note, so that he would be the prevailing party for purposes of attorneys' fees and costs, and to have interest computed on the basis that his debt stopped running, and the Bank's debt to him was reduced by the amount of the note.

### F. Interest.

 The FDIC argues that the District Court erred in its award of interest after the insolvency, based on the Tenth Circuit's decision in *Philadelphia Gear Corp. v. FDIC,* 751 F.2d 1131 (10th Cir.1985), *rev'd,* 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986). The well established rule in this circuit is that "interest upon a claim erroneously disallowed by the receiver should be calculated at the applicable legal rate." *First Empire Bank–New York v. FDIC,* 634 F.2d 1222, 1225 (9th Cir.1980) (citation omitted), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 406 (1981). The FDIC has not disputed that the assets of the receivership were sufficient to pay all provable claims in full. We have held that "the responsibility lies on the FDIC under [12 U.S.C.] § 194 to compensate appellants for its failure as Receiver to make distributions ratably." *First Empire Bank–New York v. FDIC,* 572 F.2d 1361, 1371 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). Where a ratable distribution was not made, and holders of letters of credit were entitled to it, we have held that they are "entitled to recover the

interest accruing on each letter." *Id.* at 1372. We therefore affirm the award of interest.[2]

### III. Conclusion.

We affirm Murphy's judgment against the FDIC, and the judgment in favor of First Interstate. We reverse the FDIC's judgment against Murphy on his promissory note, because he was entitled to a set-off. We remand for recomputation of Murphy's judgment against the FDIC in accord with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**2.** We need not consider whether this aspect of *First Empire* survives the new 12 U.S.C. § 1821(i)(2), enacted subsequent to the events in this case as part of FIRREA. The FDIC has not

argued that this statute applies retroactively or that it would prevent an award of interest under the facts of this case.